*Reversed and remanded.*

Hurt, J., absent.

28  151
31   17

## ED. GIEBEL v. THE STATE.

*No. 3151.   Decided November 2.*

**1. Constitutional and Statutory Enactments Construed — Criminal District Court of Galveston and Harris Counties.**—The enactments, constitutional and statutory, creating the "Criminal District Court of Galveston and Harris Counties" organized a single criminal judicial district comprising the counties of Galveston and Harris, each with a separate and independent jurisdiction. Neither of the said enactments can be construed to confer upon the said separate jurisdictions the common designation of "The Criminal District Court of Galveston and Harris Counties." On the contrary, the proper designation of the one is the "Criminal District Court of Galveston County" (or "of the County of Galveston"), and of the other, the "Criminal District Court of Harris County" (or "of the County of Harris"). Galveston being the county of the forum, the motion to quash is based upon the fact that the indictment shows upon its face to have been presented in the "Criminal District Court of the County of Galveston," instead of in the "Criminal District Court of Galveston and Harris Counties." *Held*, that the motion was properly overruled.

**2. Murder—Malice.**—Indictment for murder is sufficient as to the allegation of malice if it alleges "malice aforethought," and need not allege "express malice." Nor need it allege specifically whereat upon the body the mortal wound was inflicted.

**3. Jury Law—Interpretation of the Codes.**—Article 3032 of the Revised Statutes requires that, the jury commissioners having drawn and entered upon separate lists the names of persons to serve as petit jurors for each week of the next term of the District Court, in the manner prescribed by article 3031, the said "several lists of names drawn shall be certified under the hands of the commissioners to be the lists drawn by them for said several weeks, and shall be sealed up in separate envelopes, indorsed: "Lists of petit jurors for the —— week of the —— term of the —— Court of —— County." *Held*, that the "indorsement" thus provided for is required to be made upon the envelope, and not upon the list, as caption or heading thereto.

**4. Same—Special Venire—Case Stated.**—The minutes of the court show that at the March term of the court commissioners were appointed to select jurors to serve at the next term, which was to convene in May. By inadvertence the commissioners so appointed, in writing the caption or heading of the several lists, wrote "April term" instead of "May term," and so returned them in the sealed envelope delivered by them to the judge. The motion to vacate and set aside the special venire, because of this misdescription of the term of the court in the heading of said lists, is based upon the objection that the persons named in the said lists could not legally serve as jurors at the said May term. But *held*, that it being in no manner shown that the envelopes in which the lists were enclosed were not properly indorsed, the presumption obtains that they were so indorsed; wherefore the motion to vacate the special venire was properly overruled.

**5. Practice—Evidence—Continuance.**—The trial court did not err in refusing the defendant a continuance in order to enable him to obtain the benefit of the provi-

sions of the recently enacted, and not yet operative statute, qualifying a defendant to testify in his own behalf.

6. **Same.**—Section 39 of article 3 of the Constitution provides that "no law passed by the Legislature, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency, which emergency must be expressed in a preamble or in the body of the act, the Legislature shall, by a vote of two-thirds of all the members elected to each house, otherwise direct; and said vote to be taken by yeas and nays, and entered upon the journal." *Held,* that the passage of an act containing an emergency clause, by a vote of less than two-thirds of all the members elected to each house of the Legislature, effectually eliminates the emergency clause, and the act does not become operative until ninety days after the adjournment of the session of the Legislature at which it is enacted; and within this category comes the Act of April 4, 1889, qualifying a defendant to testify in his own behalf. The said act not being operative at the time of this trial, the trial court did not err in refusing to permit the defendant to testify in his own behalf.

7. **Practice—Jury Law.**—A special venireman answered on his *voir dire* that he had a bias in favor of the defendant, but that he could try the case fairly and impartially as between the State and defendant. Being challenged by the State for cause, and the challenge being sustained by the court, the defendant excepted. *Held,* that the action of the court was not erroneous, its effect not being to force an objectionable juror on the defendant.

8. **Evidence.**—Declarations of a defendant, to be admissible as *res gestæ* in his behalf, must stand in immediate causal relation to the act, and became part either of the action immediately producing it, or of the action which it immediately produces. Under this rule the trial court did not err in refusing to permit the defense to prove the declarations of the defendant to a witness three hours before the homicide, as to threats uttered by the deceased on the day of the homicide, and that the deceased assaulted him, defendant, on that day with a knife.

9. **Same.**—No rule of evidence will admit irrelevant, immaterial, and incompetent defensive testimony over the State's objection, because without objection by the defense the State was permitted to elicit irrelevant and immaterial testimony. Confuting no proof made by the State, the testimony offered in rebuttal by the defense in this case was properly rejected.

10. **Same—Insanity.**—The rule that, in charging the jury in cases of insanity, whether the defense interposed be general or partial insanity, the instruction must devolve the test upon the defendant's capacity to distinguish right from wrong as to the particular act charged, does not necessarily so restrict the evidence introduced *pro* or *con,* when the issue made is general insanity. If general insanity, which renders the party wholly irresponsible for his acts, be the issue, then general proof as to his knowledge of right and wrong is the appropriate test; but if the issue be partial insanity, then the inquiry must be more particularly directed to the mental status at the time of and with respect to the particular act charged. A defense witness on this trial having testified to facts upon which he based his opinion that the defendant was insane, was asked by the State on cross-examination, "whether, in his opinion, defendant knew right from wrong?" The defense objected that the question was too general, and that the inquiry should be restricted to the defendant's mental status with reference to the act charged; which objection the court overruled. *Held,* that the ruling was not error, general insanity being the defense relied upon, and it not appearing that the defendant was denied the right to fully examine the witness as to defendant's mental status with respect to the particular act for which he was on trial.

11. **Manslaughter—Negligent and Accidental Homicide—Charge of the Court.**—See the statement of the case for evidence held not to demand of the trial court instructions upon the law either of manslaughter or negligent homicide; and in view

of which, as bearing upon the issue of accidental homicide, the court sufficiently charged that in order to convict the jury should find that the killing was intentionally done.

12. **Same—Insanity—Case Approved.**—To a charge upon the law of insanity it is objected that it was upon the degree or measure, if not directly upon the weight of evidence, in that it instructed the jury that the insanity must be *clearly* proved in order to establish a defense on that ground. *Held*, that the objection was properly overruled. Smith v. The State, 19 Texas Ct. App., 95, approved.

13. **Same—Self-Defense.**—As part of the law of self-defense in this case, the trial court charged the jury as follows: "An officer who has made such arrest has no right to use a deadly weapon upon the person so arrested after his arrest, or at any time, except it be in the necessary defense of his own person from some serious bodily injury then about to be inflicted upon him by such prisoner; he has no right to take the life of the person arrested, or about to be arrested, even though such person resists such arrest, unless the life of the officer is endangered by the use or attempted use of such force by the person arrested, or about to be arrested, and of such a character as to create in him just ground to fear that his own life will be taken, or that he will suffer great bodily injury thereby." *Held*, correct, and not obnoxious to the objection that it bases the right of self-defense upon the actual existence of danger, and not upon its reasonable appearance.

APPEAL from the Criminal District Court of Galveston. Tried below before Hon. C. L. Cleveland.

The conviction in this case was in the second degree for the murder of Robert Crawford, the penalty assessed by the verdict being a term of twelve years in the penitentiary. The proof shows that the homicide occurred in the city of Galveston, about 3 o'clock on the afternoon of December 26, 1888. The statement of facts comprehends the testimony of a large number of witnesses, which is summarized below without regard to the order in which the witnesses testified.

Dan Morris testified for the State that while in conversation with a friend in front of Miller's store, on the northwest corner of Market and Twenty-second streets, a few minutes before the homicide, he observed Crawford, the deceased, sitting on a stoop under the show window of Goggin's store, on Twenty-second Street, with his elbows on his knees, and his face buried in his hands. Within a few minutes the defendant approached the deceased, seized him, pulled him to his feet, and, as the witness thought; struck at him. Deceased covered his face with his hands as if to ward off the blow. Defendant then pushed the deceased before him toward the corner. While at Goggin's corner the defendant made an effort to draw his pistol, but it caught in some manner under his coat. Deceased did not strike or strike at the defendant. Defendant pushed the deceased before him as far as Kahn's grocery store, forty or fifty feet distant from Goggin's store, where he again struck the deceased, the deceased making no effort to strike back. He then proceeded with the deceased, holding him by the coat collar, and shoving him forward. Witness followed until he reached Fahey's corner, from which point he saw the defendant and the deceased in front of Balke's cigar

store. At that point they had quite a scuffle, the deceased making the first resistance observed by the witness. In some manner the two men became separated. Defendant drew his pistol, presented it at deceased's head, fired, and deceased fell. The witness was unable to say whether the pistol was fired intentionally, whether it was discharged by defendant striking a blow with it, or whether defendant's finger was on the trigger at the time it was discharged. He did not see a knife in Crawford's hand at any time.

On cross-examination the witness stated that the encounter at Balke's cigar store was in the nature of a scuffle, or perhaps a fist fight. He thought the two men were striking at each other with their fists. As well as he could tell at the time, the men fell against a show case and separated; then defendant fell to his knees, got up, the two men came together again, and defendant quickly drew his pistol, placed it near deceased's head, and it was discharged. Officer Henderson, who at the time was on the corner of Twenty-second Street, approached immediately and took the pistol from the defendant. Deceased was in his shirt-sleeves, and was bare-headed when shot. The witness did not hear anything said by either the defendant or deceased when they passed Kahn's store. He had previously seen Crawford, but was not personally acquainted with him, and could not say whether he was drunk or sober.

H. Ackerman, a witness for the State, testified that when defendant discovered deceased sitting under Goggin's show window he struck him on each side of the head with his hands. Deceased asked, "What are you hitting me for?" Defendant placed one hand on deceased's shoulder and replied, "I want you, you son-of-a-bitch!" He then put his hand in his pocket and partly drew his pistol, but a number of people rushing across the street he dropped his pistol back into his pocket. Deceased then undertook to get up, but defendant seized him by the nape of the neck and pressed him down, and again drew his pistol, but at the renewed approach of the crowd, put his pistol back in his pocket. Deceased then got up, and he and defendant—the former in front—walked off towards Twenty-first Street, followed by a crowd. Defendant did not have hold of deceased when they started off. While sitting on the stoop at Goggin's corner the deceased had his coat lying across his lap. Witness afterwards picked it up at that place and gave it to a policeman. When he picked it up an oyster knife fell out of it, which knife he also gave to a policeman. Witness did not know what became of the deceased's hat.

This witness was subjected to a rigid and searching cross-examination by the defense, which resulted in little else than a circumstantial repetition of his testimony in chief, with perhaps a somewhat more positive avowal that the defendant said nothing whatever to the deceased before striking him on each side of the head when he first discovered him sitting

on the stoop. The defense then propounded to the witness the following questions:

"Did you not make to the *News* reporter at the time of the homicide or shortly afterward the statement that 'when the officer (the defendant) got up to him he said something, I don't know what, and then drew his pistol on deceased, and then pulled deceased up, and then, grabbing him by the shoulder, pulled him up again?'" To which the witness replied, "I can't understand exactly, because there was a big crowd there, but some of that was so. I said awhile ago that the first thing Giebel did was to strike him on both sides of the head while he, Crawford, was sitting down."

Question. "Did you say that 'when the officer got up to him he said something, I don't know what, and pulled a pistol on deceased; he then put the pistol up again, grabbed the deceased by the shoulders, and pulled him up.' Is that right?" To which the witness replied, "Yes, sir. He struck him first before he pulled him up, and that statement can not be correct."

On his re-examination the witness stated as follows: "If I made any statement to a *News* reporter, I made it on the street within ten minutes afterwards. The statement I now make is correct, and if the *News* man did not put down that he slapped Crawford while he was sitting there, it was an inaccuracy in stating it."

J. E. Mason testified for the State that while standing in front of his store on the evening of December 26, 1888, his attention was attracted by a confusion up the street. He then saw the defendant and the deceased near the savings bank, going east. Defendant had the deceased by the back of the neck pushing him forward. At or near the corner of Center Street the defendant struck the deceased two severe blows on the side of the face or head, and hurriedly pushed him forward until they reached Balke's cigar store. At that point the defendant struck the deceased two or three more severe blows, when the deceased broke loose and appeared to show fight. Two or three blows passed, when it appeared to witness that defendant fell up against the show case on the sidewalk in front of the cigar store. It then appeared that he aimed a blow at the deceased. A pistol was immediately discharged and the deceased fell. Witness did not see the pistol, but heard the report and saw the smoke. Deceased was going along peaceably, making no demonstrations, when defendant struck the first blows that the witness saw. On his cross-examination the witness said that it appeared to him that when the pistol was discharged the defendant was delivering a blow, but from his position he could not see the defendant's hand nor his pistol, and could not say that he struck deceased with the pistol, discharging it.

A. Levy, a witness for the State, located himself ten or twelve feet distant from the combatants at the moment of the fatal shooting. He

testified that defendant was pushing the deceased along, and when they got in front of witness's store, in the door of which witness was standing, defendant struck the deceased with his fist, and then pushed him along until they reached the front of Balke's cigar store. At that point he again struck the deceased, staggering him against the outside show case. They separated, and defendant struck at deceased. Deceased struck back, when defendant, springing backward two or three steps, exclaimed, "I will fix you, you son-of-a-bitch!" drew his pistol and shot the deceased in the head. The parties were five or six feet apart when the shot was fired.

The rigid cross-examination to which this witness was subjected by the defense resulted in no change of the general tenor of his testimony in chief, and elicited the only further fact that the only words the witness heard spoken by either of the parties, other than the exclamation of the defendant immediately preceding the shooting, was the protest of the defendant, "I am going along," uttered when the defendant struck the first blow observed by the witness.

Policeman Driscoll testified for the State that he and Officer Davis were standing at the corner of Mechanic and Twenty-first streets about eleven o'clock on the fatal day, when they were joined by the defendant, who had a bottle in his hand. A few minutes later the deceased passed the party, his head down and muttering or talking to himself. Defendant remarked, "I wonder what in the world that fellow is talking about; I am going to see." Accordingly he followed deceased across the street into Marcus Hammer's saloon. Witness and Davis went to the saloon in the wake of defendant. About the time they got there the defendant struck at deceased with the bottle, and Davis took the bottle from him. Defendant then drew his pistol and presented it at the deceased, but witness took the pistol away from him, and took him to the police station, and Davis took deceased away in another direction. Defendant was saying something to deceased when witness and Davis reached the saloon, but witness did not understand what he said. Witness did not arrest defendant when he took him to the police station. It was possible for the defendant to have shot deceased at that time before being disarmed.

[The foregoing constitutes the material substance of the testimony of the witness Driscoll, although in its entirety it covers several pages of the record—most of it reiterative. It is somewhat confused as to whether he took the pistol and Davis the bottle from defendant, or Davis the pistol and he the bottle; but his last statement was that he took the pistol and Davis the bottle, as set out above. It will be observed that the difficulty about which he testifies occurred several hours before the homicide.—REPORTER.]

It is recited in the record that "Officer Davis corroborated the testimony of Officer Driscoll as to the first difficulty at Hammer's saloon."

The witness Davis also testified that deceased had run against a man named Fisk, who was with defendant, which appeared to be the immediate cause of that difficulty. Defendant and deceased were both under the influence of liquor. Deceased made no effort to strike defendant during that difficulty. On his cross-examination the witness stated that when the defendant attempted to strike deceased with the bottle, deceased asked "what it meant?" and afterwards remarked, "The son-of-bitch (meaning defendant) will not get away with that break; if he does, he will be the first man who ever did." Deceased and Fisk collided as the one was going into and the other out of Hammer's saloon. Deceased told witness that immediately after the collision Fisk called him a son-of-a-bitch. Witness regarded deceased as a man who would fight—who would seek rather than avoid a difficulty. The witness did not think that defendant's pistol—a double action 28(?) calibre—would powder-burn at the distance of four or six feet, but it would at one or two feet. Witness would not carry a double action pistol, because he regarded such a weapon as liable to go off when there was no intention to discharge it. He did not think that a blow with the barrel would discharge such a pistol, unless the hammer rested on a cartridge, or the finger was on the trigger.

Charles Balke, in front of whose business establishment the final difficulty occurred, testified for the State that he was absent from his store until a moment before the fatal shot was fired. He was returning from the Strand and had reached the corner of Center Street when he discovered the parties scuffling near his show case. He hastened his steps in order to save his show case from damage, and had reached a point within eight feet of the parties when defendant fired the fatal shot. Defendant held the deceased by the neck with one hand, and with the other fired the fatal shot, holding the pistol within an inch or two of deceased's head. About an hour before the shooting defendant came by witness's place, and showed witness an oyster knife, and remarked to witness, "This is what Crawford was going to kill me with."

Officer Henderson, testifying for the prosecution, stated, in substance, that he was off duty on the fatal day. While at the corner of Market and Twenty-second streets, he observed what he took to be a drunken man sitting on the stoop under Goggin's store, and started to Tremont Street to report the fact to an officer on duty. About the time he reached Kory's place he looked back and saw defendant handling the man about as an officer would handle a drunken man to arouse him. He did not see defendant deliberately strike the deceased at that time. Witness followed the parties to about Fahey's corner, when he saw the defendant draw his pistol. He then hastened his steps, but the fatal shot was fired before he could reach the scene.

Cross-examined the witness said that defendant was not on duty on the

fatal day, and did not have on his uniform at the time of the fatal shoot-
ing.    When witness observed the pistol it was raised in a position to strike
down.    Defendant had returned his pistol to his pocket when witness
reached him.    The witness did not know how the pistol was discharged.
A double acting pistol was more likely than a single action to be dis-
charged by rough handling.    For some months prior to the killing the
defendant had talked to witness in an incoherent manner, and witness
believed his mental condition so far impaired by family troubles as to un-
fit him for police service, and had so often expressed his opinion, but
never to the mayor, the chief of police, or the police committee of the
council.

Mrs. Trumbuhl testified for the State that the deceased boarded with
her in December, 1888.    At about 3 o'clock on the fatal evening the de-
fendant came to the witness's house and asked for the deceased.    Wit-
ness sent him upstairs to see if deceased was in his room.

M. L. Burns testified for the State that he was standing in the door of
the New Orleans store, adjoining the cigar store, at the time the fatal
shot was fired.    About the time the defendant and deceased reached that
store, the former pushing the latter along, the defendant said, "I have
had bother with you enough, and brought you far enough; I will give it
to you now!"    He then shook and "thumped" deceased until deceased
fell to his knees.    Deceased got up and struck at defendant, when a "tus-
sel" ensued, the result of which was to throw the parties against the
cigar show case.    Defendant then released deceased, and stooped as if
to run, but instead, drew his pistol, shouted, "Damn you, I have had
enough!" and fired the fatal shot. ˙ Deceased was making no resistance to
defendant while the latter was jerking and pushing him along, but as the
witness understood him, was expostulating with defendant for "hust-
ling" him.

The material fact testified to by the State's witness Gallagher was that
he observed the defendant striking the deceased at a point about a block
from the place of the killing.    The deceased was going along quietly,
apparently in the custody of the defendant, when defendant struck him
one or more severe blows.    He then put his hands behind his head as if
to ward off the blows, and said, "Don't hit me any more; I am going
along all right."    Defendant replied, "I will make you go."    The wit-
ness did not particularly observe the parties again until he heard the re-
port of the pistol, about five minutes later, when he went to the place of
the killing and saw the deceased lying on the ground, and defendant
standing by with a pistol in his hand.

Fred Bleeker was the first witness for the defense.    He testified that
as the defendant was in the act of boarding a street car at the corner of
Market and Twenty-first streets, at 1 o'clock on the fatal day, a young
man called him back, cursing him.    Defendant, who had a bottle at the

time, went back and struck the young man, and as he did so, a knife dropped to the ground, which the defendant picked up. Defendant had no knife in his hand at the time he struck the young man.

Fred Kuers testified for the defense that he was on the car referred to by the preceding witness. Deceased followed defendant to that car and called to him, "You d—d Dutch son-of-a-bitch, I'll do it right here!" Defendant put his fare in the box and then left the car and went back. As the car passed on the witness saw defendant advancing upon deceased, shaking his finger, the deceased at the time having his hand behind him. Deceased was reputed to be a man who would fight.

James Swarbrick testified for the defense that he was in Fred Smith's restaurant about one o'clock on the fatal day, when deceased, under the influence of liquor, came in and asked the man at the counter if "because a man wears bright buttons has he the right to walk on me?" He then asked the man, whom he called Jack, whether the defendant was on day or night duty, and then remarked, "I'll be d—d if anybody can lick me."

Jack Koehler, an employe in a restaurant on Twentieth Street, testified for the defense that on the afternoon of the fatal day the deceased, excited and under the influence of liquor, came into the restaurant and requested the loan of a pistol. An hour afterwards the witness heard of his being killed.

Henry Aiken testified for the defense that he was present in a restaurant on Twentieth Street on the day preceding the homicide, and heard deceased telling Jack Koehler about a difficulty he had with defendant on the day before. He said that defendant threw his pistol down on him, and that he called the defendant "a son-of-a-bitch who did not have the nerve to shoot, and that he was going to make him take it back."

Philip Du Four was the next witness for the defense. He testified that he was a clerk in the establishment of Mr. Eberling in December, 1888. One day during that month the deceased came into that establishment and passed into a back room, where he secreted himself. Soon afterwards the defendant came in and asked if deceased was in the house. The witness replied that he was not. Immediately after the defendant left the deceased reappeared in the front room, having in his hand a large knife wrapped in a handkerchief. Witness asked him what trouble he had with defendant. He replied, "I will kill him!" at the same time cursing defendant and calling him the vilest of names. Witness asked him again, "Boy, what have you got to do with Ed Giebel?" He replied, "He is mad about his wife." Witness remarked, "You should not mix in family business." He replied, "I will kill the d—d son-of-a-bitch, anyhow!" On two other occasions the witness heard the deceased tell other boys that he, deceased, had "screwed" the defendant's wife. Wit-

ness never told the defendant what he heard the deceased say about his wife.

William Fisk, a witness for defense, testified: "I was with defendant at Hammer's saloon the morning of December 26, when we met Crawford. Crawford was there, and as I came out of the saloon he asked me to give him a drink. I refused, and Crawford called me a 'son-of-a-bitch.' Giebel then pushed Crawford away and struck at him with a bottle. Giebel and I then went up to the police court, and then to Joe Fadden's, corner Market and Twentieth, where Crawford overtook us, and Giebel told him to keep away. He threatened Giebel, and Giebel pulled his revolver and struck him on the hand with it and knocked a knife out of it. Giebel had gotten on a street car and then got off again, and Crawford followed him. Giebel gave me a bottle to hold and then drew his revolver. I told Giebel not to shoot. When Giebel struck Crawford's hand and knocked an oyster knife out of it, he picked up the knife and said, 'That's the knife he would kill me with.' When Crawford called Giebel out of the car he called him a son-of-a-bitch and a coward; said he would not fight, and called him other names. Crawford said something about Giebel's wife, but I could not make out what it was. Crawford told Giebel he could do him up. When Giebel knocked the knife out of Crawford's hand he put his pistol in his pocket, and he and I took the next car going east on Market Street."

On his cross-examination the witness denied that he and the deceased, the one going in and the other coming out of Hammer's saloon, collided; and declared that if defendant, after striking at deceased in that saloon with a bottle, drew a pistol, he, the witness, did not see it. He further stated that defendant had taken but three drinks, so far as he knew, at the time of the difficulty at Hammer's saloon, and that he was not then under the influence of liquor.

Julius Lienbach testified for the defense that he saw the fatal encounter from his room upstairs across the street from the cigar store. Defendant had the deceased by the collar, and deceased had his hand behind him. Witness thought deceased was resisting arrest, and started downstairs. The fatal shot was fired before he got downstairs. He saw no blows struck by either party, but saw deceased throw his hand behind him.

The proof shows that the defendant's wife secured a divorce from him in October, 1888, and that for some time prior to that date the defendant's domestic relations had not been amicable. A number of defense witnesses testified that the defendant's mental condition underwent a change about the time his domestic relations became strained, and that subsequent to that time they regarded the defendant to be periodically of unsound or unbalanced mind. Two or more of these witnesses, including the divorced wife of the defendant, each stating the facts upon

which they based their opinion, declared their belief that, when under the influence of liquor, the defendant was utterly irrational and incapable of distinguishing right from wrong. The general tenor of the testimony was that the defendant was drinking at the time of the homicide. A number of witnesses for the defense testified that the general reputation of the deceased was that he was a quarrelsome and dangerous man, particularly when in liquor. It was also proved that deceased was physically a more powerful man than the defendant. The defense closed.

Hugo Saur testified for the State, in rebuttal, that he was at the Atlanta House about two o'clock on the fatal afternoon, when defendant came there hunting for deceased—the said house being the boarding place of the deceased. He went upstairs, where deceased had a room, first declaring to witness that he had been looking for deceased. When he came back downstairs he said to witness, "I want to get that son-of-a-bitch! He wanted to stab me with this knife, and I intend to shoot him down as soon as I find him!" Witness told defendant that he ought not to do as he threatened, and defendant in reply asked, "What am I an officer for?" He then exhibited a pistol to witness, remarking, "This is better than a knife."

Mrs. Jennie Bathman testified for the State, in rebuttal, that she was divorced from the defendant on the 12th day of October, 1888, and married Herman Bathman on the 27th day of the same month. Deceased had never had carnal knowledge of the witness, and witness "did not suppose that Mr. Giebel had ever charged or suspected Robert Crawford of improper relations with her." As a matter of fact, the defendant's jealousy of the witness's present husband was the cause of their domestic trouble.

*J. B. & C. I. Stubbs,* for appellant.—1. The court erred in overruling the motion to quash the indictment and refusing to arrest the judgment for the reasons set forth in both of said motions, which are, in substance, that the indictment did not appear to have been presented in the Criminal District Court of Galveston and Harris Counties; because it does not charge express malice, nor the offense of murder, nor the place in or upon the person of deceased where the alleged fatal wound was inflicted. Authorities: The title and designation of the lower court is the "Criminal District Court of Galveston and Harris Counties." Const., art. 5, sec. 1. The indictment, this court has held, should state where upon the person of deceased the wound was inflicted, as well as how. Nelson v. The State, 1 Texas Ct. App., 42; Strickland v. The State, 19 Texas Ct. App., 518.

2. The court erred in refusing to vacate and set aside the special venire on account of the same having been drawn for the April term, there being no such term of the Criminal District Court; and because the re-

port of the commissioners does not state for what court the jurors were drawn, or in what county the court was to be held.

Revised Statutes, articles 3032, *et seq.*, prescribe in express terms how the commissioners shall draw and return the lists of jurors, and the form of the certificate and endorsement to be made by them, which requires that the term of the court, and the county in which it is to be held, shall be stated, neither of which requirements were complied with in this case. Recitals in the minutes of the court can not supply the omission of the commissioners to observe the statutes. Code Crim. Proc., art. 610; Rev. Stats., arts. 3030, *et seq.*, especially art. 3032.

3.   The court erred in overruling the application for continuance.

The principal reason which we desire to urge as cause for reversal based upon the refusal of a continuance, is that it had the effect to prohibit the defendant from becoming a witness as, under the court's construction of the law, he was not a competent witness in May, 1889, and would not become so until after the lapse of 90 days from the adjournment of the last Legislature, which passed a law permitting defendants in criminal cases to testify in their own behalf.   The application showed that the defendant would have testified that at the time of the killing he, as a policeman, was endeavoring to arrest the deceased for disorderly conduct, and was engaged in a violent personal conflict with him; that under an apprehension of serious bodily injury from the assault, acts, and threats made by the said Crawford at that time and before, and acting strictly in self-defense, he drew his pistol, intending only to frighten deceased therewith, and thus prevent further violence and resistance, but that in the haste and excitement of the struggle the weapon was struck upon the head of the deceased and was discharged by the force of the blow, without any conscious act or intention on the part of the defendant, and that this testimony could not be procured from any other source.

The defendant was offered as a witness in the course of the trial to prove that the homicide was accidentally and unintentionally committed.

The point arising upon the rejection of the testimony is presented by the eighth assignment, which appellant asks considered in connection with this one.

The question presented by this and the eighth assignment is a new one. If the law permitting defendants to testify had not gone into effect, still its spirit would have authorized a court in a case of this kind to have continued the cause to the next term, involving a delay of only two months, to procure testimony so vital and so relevant to the issue.   While it was discretionary with the court to refuse a continuance, still the exercise of that discretion is subject to review.   Acts of 1889, p. 37.

4.   The court erred in sustaining the State's challenge for cause of A. Roemer, one of the special venire, who, having answered under oath that he had a bias in favor of defendant, was asked the further question, " Is

this such a bias as will prevent you from trying the case fairly and impartially as between the State and defendant?" Roemer answered that it would not. Neither side exhausted its peremptory challenges. Code Crim. Proc., art. 636, clause 12, and note thereto in Willson's Crim. Stats., which cites the cases. The juror was clearly qualified. Stagner v. The State, 9 Texas Ct. App., 440; Pierson v. The State, 18 Texas Ct. App., 524. The fact that challenges were not exhausted could not affect the question.

5. The court erred in refusing to allow John Cossar, a witness for defendant, to testify regarding statements made to him by defendant three hours before the homicide as to threats that had been made against defendant by deceased on that day, and the further statement that deceased had on the same day assaulted defendant with a knife. This was offered as a part of the *res gestæ.* Foster v. The State, 8 Texas Ct. App., 248; Cox v. The State, Id., 254; Kennedy v. The State, 19 Texas Ct. App., 618; Willson's Crim. Stats., sec. 1047, being a note to art. 606, Penal Code, and citing numerous decisions of this court.

6. The court erred in refusing to permit Henry Bee, a witness for defendant, to answer the following question: "Did not the members of Robert Crawford's family request you to try and keep him away from their house, as they were afraid of him?" The witness would have answered in the affirmative. The evidence should have been admitted, as the question was asked on redirect examination, and was in the line of and in rebuttal to that brought out on cross-examination in regard to deceased having been arrested by the witness and the occasion of such arrest.

Upon cross-examination by the State, and in answer to its questions, this witness answered that he lived about two blocks from the family of deceased; that he was a policeman, and had occasion to arrest said Crawford once or twice—once when he struck a colored man with a paling and escaped to Dallas, but was afterwards arrested and bound over to the Criminal District Court, and that he had probably arrested him on different occasions with other young men on charges of disorderly conduct. In view of this new matter brought out by the State, defendant claimed the right to show in rebuttal, and upon the same line of testimony, that the witness in his capacity of police officer had been called into service to keep said Crawford away from the home of his relatives, they being afraid of him. Lilly v. The State, 20 Texas Ct. App., 1; Russell v. The State, 11 Texas Ct. App., 288.

7. The court erred in the following particular: The witness F. W. Beissner having testified for the defense to the facts on which he based his opinion given on the stand that defendant was mentally unsound, the State asked the question whether in the witness's opinion the defendant knew right from wrong, and to this question the defendant's counsel objected that it was too general, and insisted that the inquiry should be as

to whether the defendant had sufficient mental capacity to know right from wrong, with respect to the particular act charged. The objection was overruled, and the witness was permitted to answer, which he did in the affirmative.

It has been uniformly held in Texas that the inquiry should be directed to the defendant's knowledge of right and wrong with respect to the very act charged. Carter v. The State, 12 Texas Ct. App., 500; Webb v. The State, 5 Texas Ct. App., 596, and cases cited in section 81 of Willson's Criminal Statutes. See also Massengale v. The State, 24 Texas Ct. App., 181; S. C., 6 S. W. Rep., 35.

8. The court erred in refusing to permit the defendant to testify. He was offered as a witness to prove that the homicide was accidentally and unintentionally committed. We ask that this be considered in connection with the third assignment, questioning the correctness of the order overruling the motion for a continuance.

9. The court erred in permitting the State to ask Mrs. J. Bathman, a witness called for the State, who had previously testified that defendant was of unsound mind, whether or not the defendant, whose wife she formerly was, had ever charged or suspected that Robert Crawford had improper sexual relations with her; and whether, in fact, said Crawford had ever had such relations with the witness.

These questions, the defendant objected, were irrelevant and were not in rebuttal of any evidence for the defense. The objection was overruled, and the witness was allowed to answer, which she did in the negative. The answers were objected to on the same grounds, but were admitted.

It will be contended that the above evidence was strictly in rebuttal to that of Philip Du Four and others. Du Four testified that in December, 1888, shortly before the homicide, Crawford boasted of having had carnal intercourse with Giebel's wife, and assigned that as a reason for the animosity existing between them. This, surely, did not of itself authorize the admission of evidence as to the truth or falsity of the boast, especially from the source from which it was elicited. Testimony to the effect that Crawford had not made any such declaration might have been admissible, but nothing beyond that.

That the admission of the above evidence was improper and irrelevant is too plain to require citation of authorities. Its only effect was to prejudice the rights of defendant.

10. The court erred in refusing the special charges asked by defendant's counsel on the law of manslaughter, accidental or negligent homicide, and insanity, all of which requested charges appear in the record, and were applicable to evidence in the cause, and to issues raised by that evidence. The court also erred in the charge given, which did not present all the law applicable to the case, and which failed to instruct the

jury that it was not necessary that the danger of loss of life or serious bodily harm be actual and real, provided the defendant acted on a reasonable belief and appearance of danger; and further, the court erred in instructing the jury that insanity must be clearly proved to constitute a defense.

The charge asked upon the law of manslaughter was refused as not applicable under the evidence, and the judge so endorsed the charge.

The defendant also asked the following charge: "If the jury believe from the evidence that the deceased was accidentally or unintentionally killed, they will acquit the defendant."

The court refused this charge because, as stated in the refusal, "the court in its charge instructs the jury that in order to convict the killing must have been intended by the defendant."

The charges requested upon the law of negligent homicide of the first and second degree were refused, the court assigning as a reason therefor that they were not applicable to the evidence. Now, if any proof adduced on the trial raised, or tended to raise, the issues insisted upon in the refused instructions, however inconclusive, or however strongly it may have been contradicted, it became the imperative duty of the court to submit those issues to the jury. We are confident that this court, after a careful review of the statement of facts, will hold with us that the proof fairly demanded the charges requested and refused.

This assignment also raises the question as to the correctness of that part of the charge which is as follows: "An officer who has made such arrest has no right to use a deadly weapon upon the person so arrested after his arrest, or at any time, except it be in the necessary defense of his own person from some serious bodily injury then about to be inflicted upon him by such prisoner; he has no right to take the life of the person arrested, or about to be arrested, even though such person resists such arrest, unless the life of the officer is endangered by the use, or attempted use, of such force by the person arrested, or about to be arrested, and of such a character as to create in him just ground to fear that his own life will be taken, or that he will suffer great bodily injury thereby." Such a charge as the above has always been held objectionable, because it bases the right of self-defense upon the actual existence of danger, and not upon its reasonable appearance. It is not essential to such right that the danger should in fact exist. It may be only apparent and not real.

The court should have so charged the jury, because there was evidence that the deceased was the stronger man of the two, and was about to overpower defendant in a fight, and threw his hand behind him, as defendant may well have supposed for the purpose of drawing a knife. These, and the other facts disclosed by the record, including the repeated threats that deceased had made of his intention to kill defendant, all required a charge as to the right to act upon apparent danger. The threats

made by deceased, and the fact that he was a man of violent and danger-
ous character, and one who might reasonably be expected to execute
threats so made, were testified to by a large number of witnesses, and were
not contradicted by a single witness. High v. The State, 26 Texas Ct.
App., 545; S. C., 10 S. W. Rep., 238.

Again, the charge of the court was excepted to because it required in-
sanity to be clearly proved to establish a defense on that ground. This
is clearly a charge upon the degree or measure, if not the weight, of evi-
dence. A great many witnesses testified that the defendant was of un-
sound mind at the time of the commission of the act and prior thereto,
and testified as to facts upon which their conclusion was based. Their
evidence was not controverted by the State, and is clear and convincing
that the defendant, at the time of the homicide, was laboring under such
defect of reason caused by disease of mind as not to understand the na-
ture and quality of the act he was doing, or, if he did know it, that he
did not know that he was doing wrong. With such an accumulation of
proof, with practically no countervailing evidence, it is difficult to un-
derstand how the jury could have disregarded it, and found the prisoner
sane.

At any rate the court should not have told them that insanity must
be clearly proved to establish a defense. That is almost equivalent to in-
structing them that defendant's innocence, or what is the same thing, his
insanity, must be proved beyond a reasonable doubt. The special charge
followed precedents approved by this court and should have been given.

The following are cases in which the facts demanded a charge upon
the law of negligent homicide: Curtis v. The State, 22 Texas Ct. App.,
227; McConnell v. The State, Id., 354; Ellison v. The State, 10 Texas
Ct. App., 361.

There was evidence tending to show that defendant used his pistol on
the occasion of the homicide only to strike or frighten Crawford, and that
there was no apparent intention to kill. Robins v. The State, 9 Texas
Ct. App., 667; S. C., Id., 671; Clark's case, 19 Texas Ct. App., 495; Pe-
nal Code, arts. 578–591.

An assault and battery which shows an intention to inflict pain or in-
jury is deemed an adequate cause under the law that voluntary homicide
committed under the influence of sudden passion, arising from an ade-
quate cause, but neither justified nor excused by law, is manslaughter.

The facts in the present case required a charge upon such subject, for
the evidence is conflicting as to whether Giebel or Crawford was the first
assailant at the time of the shooting. The assault by the deceased, he
being the stronger, was likely to have caused pain. Hill v. The State, 8
Texas Ct. App., 142; Foster v. The State, Id., 248; Peter v. The State,
23 Texas Ct. App., 684; S. C., 5 S. W. Rep., 228; Howard v. The State,
Id., 265; S. C., 5 S. W. Rep., 231.

There may be other adequate causes than those mentioned by the statute. Willson's Crim. Stats., sec. 1018, being note to art. 602 of the Penal Code. See Id., sec. 1030, note to art. 603, Penal Code; Mackey v. The State, 13 Texas Ct. App., 630; Howard v. The State, *supra;* Alexander v. The State, 25 Texas Ct. App., 260; S. C., 7 S. W. Rep., 867.

The law as prescribed in articles 44 and 576 of the Penal Code should have been given as requested. The issue of accidental killing *vel non* was raised by the evidence, and should have been charged upon.

It was error to require the defense of insanity to be clearly proved. A preponderance of evidence is sufficient under all the decisions. Webber v. The State, 5 Texas Ct. App., 596; Penal Code, art. 40; Willson's Crim. Stats., sec. 85; Massengale v. The State, 24 Texas Ct. App., 181; S. C., 6 S. W. Rep., 35.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—1. In his motion to quash, the defendant excepted to the sufficiency of the indictment, both as to its form and substance. As to form, "because it does not appear to have been presented in the proper court, to-wit, the Criminal District Court of Galveston and Harris Counties." On its face it is stated that the same was presented "in the Criminal District Court of the county of Galveston, State of Texas;" and it is insisted that there is no such court. Section 1, article 5, of the Constitution, to which we are cited in support of this position, simply provides that "the Criminal District Court of Galveston and Harris Counties shall continue with the district, jurisdiction, and organization now existing by law until otherwise provided by law." The act of the Legislature creating said court was adopted July 23, 1870, and was entitled "An act to organize and define the powers of the Criminal District Court in and for the counties of Galveston and Harris, and to prescribe the duties thereof." Pasch. Dig., art. 6135, *et seq.* It is nowhere declared in the said act that the name of the court should be "the Criminal District Court of Galveston and Harris Counties." That such was not intended to be the name of the court, and that it was intended that the name of the particular court should be determined by the court name of either of the counties in which the court proceeding was had or session held, as is the case in other districts composed of more than one county, is, we think, manifestly apparent from section 3 of the Act of July 23, 1870, which provides: "The said court, in each county, shall have a seal similar to those of the District Court, with the words Criminal District Court of —— county," etc. It certainly never could have been intended that said court, when sitting in either county, should have jurisdiction of and try cases from both counties indiscriminately. We are of opinion that the words "the Criminal District Court of the county of Galveston," or

"the Criminal District Court of Galveston County," would either be proper and sufficient as the name of said court when held in Galveston County. This objection, therefore, to the form and manner of the presentment of the indictment was without merit and was properly overruled.

Appellant's objections for substance were: "Because the indictment does not charge express malice; because it does not charge murder; and because it does not state where upon or in the body of the deceased the alleged fatal wound was inflicted." The indictment is good, both in form and substance. It was not necessary to allege that the act was committed with "express malice." All that was necessary was that it should have been, as was alleged to have been done with "malice aforethought." Penal Code, art. 605; Willson's Crim. Forms, Nos. 388, 389; Sharpe v. The State, 17 Texas Ct. App., 486, and authorities collated, and a number of decisions since. See also Willson's Crim. Stats., sec. 1035. It was and is not necessary to allege in what particular portion of the body the mortal wound was inflicted. Wilkerson v. The State, 2 Texas Ct. App,, 255; Williams v. The State, 3 Texas Ct. App., 123. Neither of these objections for substance were well taken, and the court properly overruled them.

2. A motion was made by defendant to vacate and set aside the special venire, and this motion was also overruled. As shown by the minutes of the court, at the March term commissioners were appointed to select jurors for the May term, which was the next succeeding term. By inadvertence in heading the several lists of the jurors selected, these commissioners wrote "April term" instead of "May term," and so returned in the sealed envelope delivered by them to the judge. There being no "April term" of said court, it is insisted that the lists could not legally be used for the May term, or any other term, because the statute requires expressly that "the several lists of names drawn shall be certified under the hands of the commissioners to be the lists drawn by them for said several weeks, and shall be sealed up in separate envelopes and indorsed, ' Lists of petit jurors for the —— week of the —— term of the —— court of —— county.' " Rev. Stats., art. 3032. The contention is, in substance, that the jurors must be selected for the term at which they are to serve, and that "the lists" must show the term precisely for which they have been selected, or else the jury will be an illegal one.

As before stated, the minutes of the court show that the commissioners were selected to draw jurors for the May term, and the bill of exceptions recites that after the performance of this duty they came into court, "and delivered to the judge of the court, in sealed envelopes, the lists of persons selected by them to serve as grand and petit jurors at the next May term of this court." It is not stated or shown anywhere in the bill of exceptions that these envelopes were not indorsed properly as to the lists of the jurors, and properly as to the term of the court; it is only

objected that the wrong term was stated in "the headings of the lists" sealed up in the envelopes. The presumption is that the envelopes were properly indorsed, notwithstanding the headings of the lists inside made the mistake as to the month in which the next term was to be held. If the sealed envelopes were properly indorsed, then that indorsement would correct the mistake or inadvertence made in the headings of the lists; and moreover, the statute does not require "the headings of the lists" to be indorsed in the same manner as the envelopes are. As presented in the bill of exceptions no legal requirement appears to have been neglected or omitted in the matter complained of.

3. It is insisted that the court should have granted defendant's application for a continuance to the next term of the court, in order to enable defendant to testify as a witness in his own behalf, under the provisions of the Act of the Legislature, approved the 4th day of April, A. D. 1889, authorizing and permitting a defendant in a criminal action to testify in his own behalf. Gen. Laws 21st Leg., p. 37. Defendant also proposed to testify in the case, and the court refused him the privilege. His contention on the last point is that the bill contains an emergency clause, and expressly enacts in the body of the bill, "that this act take effect from its passage."

By section 39 of article 3 of the Constitution, it is declared that "No law passed by the Legislature, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency, which emergency must be expressed in a preamble or in the body of the act, the Legislature shall, by a vote of two-thirds of all the members elected to each house, otherwise direct; and said vote to be taken by yeas and nays, entered upon the journals." In the publication of this act it is shown that the same did not receive the vote of two-thirds of the members elected; and consequently, the emergency clause did not become operative so as to take it out of the general rule that ninety days must elapse after adjournment before the act became effective. The session was adjourned on the 6th day of April, and the law did not go into effect until the 6th day of the following July. This trial took place on the 21st day of May, 1889, and the law not having gone into effect, defendant could not claim, and was not entitled to, the benefits and privileges it afforded. Nor was he entitled to have his case continued until said act should become operative in order that he might avail himself of the rights it accorded.

4. One A. Roemer, summoned as one of the special *veniremen,* on his examination answered, under oath, that he had a bias in favor of defendant, though he stated that such bias would not prevent him "from trying the case fairly and impartially as between the State and defendant." He was challenged for cause by the prosecution, and the challenge was sustained by the court. There was no error in this ruling. Code Crim.

Proc., art. 636, subdiv. 12; Mason v. The State, 15 Texas Ct. App., 534; Pierson v. The State, 18 Texas Ct. App., 524. No injury is shown, and no objectionable juror was forced upon the defendant. Loggins v. The State, 12 Texas Ct. App., 65; Bolding v. The State, 23 Texas Ct. App., 172; Henning v. The State, 24 Texas Ct. App., 315.

5. An exception was saved by defendant to the refusal of the court to allow him to prove by his witness Cossar "statements made to him by defendant three hours before the homicide as to threats that had been made by deceased against defendant on that day; and the further statement that deceased, on the same day, assaulted defendant with a knife. This was offered as part of the *res gestæ*." Statements of the defendant made three hours before the homicide were not *res gestæ* as to the homicide, and were not admissible as evidence in his behalf. "To be admissible as *res gestæ*, the declarations must stand in immediate causal relation to the act, and become part either of the action immediately producing it, or of the action which it immediately produces." Bradberry v. The State, 22 Texas Ct. App., 273. A defendant can not make evidence for himself by his acts and declarations which were not part of the *res gestæ*. Willson's Crim. Stats., sec. 1047.

Again, the court refused to permit defendant to prove by his witness Henry Bee, who was a policeman, that the members of deceased's family had requested the witness to keep the deceased from their house, as they were afraid of him. This testimony, it was claimed, was in rebuttal to evidence brought out by the State. We find no evidence in the record to which this evidence could properly be called rebutting evidence. That the State might have been permitted, without objection from defendant, to elicit immaterial and irrelevant testimony in line or keeping with that proposed, is no reason why irrelevant, immaterial, and incompetent evidence for defendant should be admitted when promptly and properly objected to by the State.

6. Defendant's witness Beissner testified to facts upon which he based his opinion that defendant was insane. On cross-examination the prosecution asked the witness whether, in his opinion, defendant knew right from wrong? The question was objected to by defendant because too general; that the inquiry should be restricted and limited to defendant's mental capacity and knowledge as to the right and wrong of the particular act charged. In Carter's case, 12 Texas, 500, and cited by appellant's counsel, it was held that the question in cases of insanity is whether the defendant was capable of distinguishing right from wrong, which capacity is necessary for the existence of a criminal intent. In cases of partial insanity the question is whether the defendant was capable of distinguishing right from wrong in the particular connection in which the unlawful act was done. The effort upon this defense was to establish general and not partial insanity. General insanity renders the party wholly irresponsible

for his acts, and general proof as to a knowledge of right and wrong is an appropriate test.

In cases of partial insanity the inquiry must be more particularly directed to the mental status at the time of, and with reference to, the particular act charged. This is with reference to the character of the evidence adduced in support of or in refutation of the truth of the plea. When the court is charging the jury in a case where the plea is interposed, whether the issue be general or only partial insanity, the test is whether the defendant knew the right or wrong as to the particular act charged, and such, it seems, should and must be the nature of the instruction. Erwin v. The State, 10 Texas Ct. App., 700; Thomas v. The State, 40 Texas, 60; Willson's Crim. Stats., sec. 81. In this case it has not been made to appear that the question asked, and the answer thereto, were illegal or objectionable, or that defendant has in any manner been injured. It does not appear that defendant was denied the right to examine the witness fully as to defendant's knowledge of right and wrong with reference to the very particular act with which he was charged.

7. Defendant proved by his witness Du Four, and others, that shortly before the homicide the deceased, Crawford, had boasted that he, deceased, had had carnal intercourse with defendant's former wife, and that he had assigned that as the reason of the animosity and hostility existing between them. To meet this evidence the prosecution was permitted to prove by Mrs. Bathman, defendant's divorced wife (who had been divorced in October prior to the killing, which was in December), that defendant had never charged her with nor suspected her of improper relations with deceased, and that she had never had such improper sexual relations with deceased. Objection to this evidence was that it was irrelevant and not in rebuttal of any evidence introduced by the defense. We are of opinion that the evidence was relevant and in rebuttal of defendant's witnesses, and was not inadmissible upon the grounds of objection urged to it. The statutory inhibition against husband and wife testifying to communications had between the parties whilst the marriage relation subsisted (Code Crim. Proc., art. 734), was not urged as an objection to the evidence.

8. Special instructions were requested to be given the jury upon the law of manslaughter, accidental or negligent homicide, and insanity, which were refused by the court. No charge was given by the court upon manslaughter or accidental and negligent homicide. As to manslaughter and negligent homicide, we are of opinion that in no phase of the evidence are such issues fairly and legally raised, and that the court did not err in refusing to give such instructions.

The court expressly charged the jury as to accidental homicide, that in order to convict they must find that the killing was intentionally done. In the light of the facts this was sufficient.

Upon the question of insanity the charge was in the language of approved forms. Clark v. The State, 8 Texas Ct. App., 350; Smith v. The State, 22 Texas Ct. App., 317; Willson's Crim. Forms, No. 715. It is insisted that the instruction is erroneous, and is a charge upon the degree or measure, if not upon the weight, of evidence, in that it requires the insanity to be *clearly* proved to establish a defense on that ground. This identical position is discussed and settled in support of the instruction in Smith's case, 19 Texas Court of Appeals, 95.

In The People v. Hamilton, 62 California, 377, the Supreme Court of California say: "In the connection in which the words are used, to say that insanity must be 'clearly established,' is not to say that the evidence must more than preponderate, but only that the preponderance must be plainly apparent. Such must be the case in every instance where the affirmative of an issue is sought to be established and a peculiar presumption overcome. There may be greater or less degree of lucidity, but the preponderance must be distinctly perceptible. * * * In civil cases fraud is proved by a preponderance of the evidence, yet, inasmuch as the law, to the credit of human nature, presumes that men are oftener honest than dishonest, the preponderance must clearly appear. Thus only can the fact of fraud or insanity be 'satisfactorily proved.' Under the rule, now well settled in this State, 'to render his plea of insanity available as a defense, it devolves upon an accused to establish his insanity by a preponderance of evidence to the satisfaction of the jury.'" Leache v. The State, 22 Texas Ct. App., 281.

We are of opinion that upon the law of self-defense the charge of the court was as full and explicit as the facts demanded. That portion of it with reference to the right of an officer to use a deadly weapon upon an arrested party in his custody only when in the *necessary defense* of his own person from serious bodily injury then about to be inflicted upon him by such prisoner, is not, in our opinion, obnoxious to the objection urged that it bases the right of self-defense upon the actual existence of danger, and not upon its reasonable appearance. "The whole doctrine of self-defense rests upon the comprehensive principle of reasonable necessity, and apparent reasonable necessity is the whole law of defense. It is the right to do whatever is reasonably *necessary* to be done in warding off or avoiding serious injury under the circumstances of the case." Weaver v. The State, 19 Texas Ct. App., 548. The defense must appear *necessary*, whether it arises from real or apparent danger.

We have discussed all the questions raised and so ably presented in the brief of counsel for appellant, and upon the voluminous record submitted in the case we have found no reversible error. The judgment is affirmed.

*Affirmed.*

Hurt, J., absent.