**UNITED STATES v. BARLOW et al.**

**No. 14479 Criminal.**

District Court, D. Utah, Central Division.

March 18, 1944.

Appeal Dismissed Aug. 8, 1944.

See 65 S.Ct. 25.

Dan B. Shields, U. S. Atty., and John S. Boyden, Asst. U. S. Atty., both of Salt Lake City, Utah, for the United States.

J. H. McKnight, Claude T. Barnes, and Knox Patterson, all of Salt Lake City, Utah, for the defendants.

SYMES, District Judge.

This matter is before me on defendants' motion to quash the indictment. Several grounds are set forth. Being of the opinion that the first ground, to wit, that the indictment be quashed and set aside because it does not state a Federal offense, is good, it will not be necessary to discuss other grounds set out in the motion.

The indictment charges a group of defendants with conspiring to commit an offense against the United States, § 88, 18 U.S.C.A., § 37, Crim.Code. The object of the conspiracy as charged is to violate § 334, 18 U.S.C.A., § 211, Crim.Code, as amended, which denounces as a crime the

mailing of obscene matter, and is in part as follows:

"Every obscene, lewd, or lascivious, and every filthy book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character, * * * is hereby declared to be nonmailable matter * * *. Whoever shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything declared by this section to be nonmailable * * * shall be fined * * *." etc.

The facts alleged in the indictment are: The defendants in order to carry out the conspiracy after it was formed, mailed out to certain parties named copies of a publication entitled "Truth," published monthly by the Truth Publishing Company in Salt Lake City. By agreement of counsel several editorials from this publication of different months—which form the gravamen of the Government's case and which it claims contain nonmailable matter under the above statute—were submitted to the court on the understanding they constitute the proof that the Government would offer in support of the charges. These editorials simply advocate the restoration of "celestial or plural marriage," stating that the Lord has restored the principle thereof.

A sample editorial from said publication for the month of April, 1943—which the Government says is typical of all and which it is claimed is within the prohibition of the statute as being lewd, lascivious and filthy —is as follows:

"The Lord restored the principle of Celestial or plural marriage in line with His promise that in this the last dispensation there would be a restitution of all things and that there should be no taking away again. Plural marriage is one of the laws of Heaven that has been restored never again to be taken from the earth or given to another people. It is a law that cannot be abrogated, modified, or postponed. The hackneyed claim that the Woodruff Manifesto of 1890 was given by revelation from the Lord to abrogate His law of Plural Marriage has been exploited by the leaders to a shocking degree, and as often has been exploded. Any person with 8th grade intelligence reading the Manifesto will discover nothing in it savoring of revelation, or as an injunction from the Lord against the continued practice of the principle. True, the subsequent interpretation given it by Wilford Woodruff, while under pressure by the enemy, and so far as it was ratified by the Church, bound the Church to a monagamic marriage system. But it was the Church that was bound, and not God".

The statute in question provides that the obscenity, lewdness or lasciviousness be contained in a book, pamphlet, picture, paper, letter, writing, printing or other publication and be of an indecent character.

■ The argument of the Government, as I understand it, is that these editorials —of which a fair sample is the quotation supra—by advocating the practice of polygamy, comes within the definition found in Swearingen v. United States, 161 U.S. 446, at page 451, 16 S.Ct. 562, at page 563, 40 L.Ed. 765:

"The words 'obscene,' 'lewd,' and 'lascivious,' as used in the statute, signify that form of immorality which has relation to sexual impurity, and have the same meaning as is given them at common law in prosecutions for obscene libel * * *."

In other words it is a violation of the law to advocate through the mails plural marriages, because in so doing the defendants necessarily advocate the violation of law and incite thoughts of sexual impurity and practices in many of their readers.

A careful reading of the editorial discloses no obscene or filthy word or expression of lewd suggestion is used or contained therein. It is restrained and nothing more than an argument in favor of a practice that for many years was a tenet of the Mormon Church, until abolished as a condition of the admission of Utah to statehood. I cannot see how any word or sentence in these editorials submitted to the court can be denominated as lascivious, or of a nature to excite erotic feelings or thoughts in the mind of the ordinary reader, or as tending to deprave public morals, or lead to impure purposes or practices.

■■ As stated in Knowles v. United States, 8 Cir., 170 F. 409, 410:

" * * * the only question before us is whether the article is obscene, lewd, or lascivious, within the meaning of the statute." That: "In all indictments under this statute there is a preliminary question for the court to say whether the writing could by any reasonable judgment be held to come within the prohibition of the law."

P. 412 of 170 F.:

"The true test to determine whether a writing comes within the meaning of the statute is whether its language has a tend-

ency to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands it may fall, by arousing or implanting in such minds obscene, lewd, or lascivious thoughts or desires."

In the Swearingen case, supra, 161 U. S. 446, 16 S.Ct. 562, 40 L.Ed. 765, the defendant, a publisher, was indicted for having mailed copies of his newspaper containing an article that was a very bitter personal attack upon a person described, describing him in the most abusive terms, i. e.: "a mental and physical bastard, a black hearted coward, a liar, perjurer, and slanderer, who would sell a mother's honor with less hesitancy and for much less silver than Judas betrayed the Saviour. Time and again has he been proven a wilful, malicious and cowardly liar."

■ The Supreme Court held that the article in question was not obscene and nonmailable, the Court saying, 161 U.S. at page 450 of 16 S.Ct. at page 563, 40 L.Ed. 765:

"The offense aimed at, in that portion of the statute we are now considering, was the use of the mails to circulate or deliver matter to corrupt the morals of the people. The words 'obscene,' 'lewd,' and 'lascivious,' as used in the statute, signify that form of immorality which has relation to sexual impurity, and have the same meaning as is given them at common law in prosecutions for obscene libel. *As the statute is highly penal, it should not be held to embrace language unless it is fairly within its letter and spirit."* (Emphasis ours).

The Court held that the whole article was exceedingly coarse and vulgar. It could not perceive anything in it of a lewd, lascivious and obscene tendency, calculated to corrupt and debauch the minds and morals of those in whose hands it might fall.

■ A reading of the publication here involved forces us to the same conclusion. As stated, it is nothing more than advocacy of a certain practice that was once part of the religion of the Mormon Church, and which this group of defendants still advocates. There is nothing in it that comes within the language of the Swearingen case, or which tends to corrupt and debauch the minds and morals of those in whose hands it might fall.

The Supreme Court passed upon this same statute later in United States v. Limehouse, 285 U.S. 424, 52 S.Ct. 412, 76 L.Ed. 843, wherein the defendant was charged with sending out certain filthy letters and writings through the mails, containing charges of sexual immorality and miscegenation and similar practices. The Court found the language was coarse, vulgar and unquestionably filthy within the popular meaning of that term, and following the Swearingen case, supra, held that in order to constitute a crime the language must be "calculated to corrupt and debauch the minds and morals of those into whose hands it might fall."

In McKnight v. United States, 9 Cir., 78 F.2d 931, it was held (syllabus 2):

"Court in considering indictments under statute prohibiting mailing of libelous and indecent matter must first determine as matter of law whether writing complained of could by any reasonable judgment be held to come within prohibition of law." And the statute being penal must be strictly construed.

■ The court takes judicial notice that the Mormon Church for many years advocated polygamy, and in so doing used the mails to disseminate its literature, advocating "celestial or plural marriages". Such a use of the mails has continued for many years without molestation, and has never before been questioned. In the interpretation of a doubtful and ambiguous statute—a uniform administration practice by the authorities in respect thereto over a considerable period of time carries weight with the court, especially where, as here, thousands of good citizens sincerely and honestly believe in it as part of their religion.

It was quite natural that when the Congress forbade plural marriages and the church agreed to submit to those laws many of the followers of the Mormon faith felt they could not conscientiously and sincerely change their beliefs in the face of what they considered the direct command of God to the contrary.

■ The constitution of Utah prohibits polygamous or plural marriages. It might well be said that any prosecution for violations thereof under our theory of government is a purely local matter for the state rather than the Federal Government, in the absence of a widespread violation of the law.

In conclusion, it might be said that the natural reaction to reading a publication setting forth that polygamy is essential to salvation is one of repugnance and does not

tend to increase sexual desire or impure thoughts. We also bear in mind that one cannot pick up a national magazine, or go to the theatre or movie without being confronted with illustrations and advertisements that tend more to incite sexual desire than do any of the publications in this magazine that have been called to our attention. In fact sex incitement is a selling point of innumerable publications and advertisements that pass without comment or prosecution.

It follows that the motion to quash the indictment should be granted and the indictment dismissed, and

It is so ordered.