## STATE v. MUSSER et al.

No. 6816. Decided December 16, 1946. (175 P. 2d 725.)

Rehearing Denied February 18, 1947.

536

538

540

See 15 C. J. S., Conspiracy, sec. 43; 11 Am. Jur. 1104. Religious belief as affecting crime of bigamy, note, 24 A. L. R. 1237. See, also, 7 Am. Jur. 752, 766; 11 Am. Jur. 558.

*Claude T. Barnes, J. H. McKnight, Knox Patterson, Ray S. McCarty* and *Edwin D. Hatch,* all of Salt Lake City, for appellants.

*Brigham E. Roberts,* Dist. Atty., and *H. D. Lowry,* Asst. Dist. Atty., both of Salt Lake City, *W. S. Wagstaff,* Asst. Atty. Gen., and *Grover A. Giles,* Atty. Gen., for respondent.

McDONOUGH, Justice.

By information 33 persons were accused of criminal conspiracy to commit acts injurious to public morals in violation of Sec. 103-11-1 (5), U. C. A. 1943. The information in substance charges that between June 1, 1935, and March 1, 1944, in Salt Lake County, State of Utah, the defendants wilfully and unlawfully agreed, combined, conspired and confederated among themselves and with other persons unknown to the district attorney,

"to advocate, promote, encourage, urge, teach, counsel, advise *and* practice polygamous or plural marriages and to advocate, promote, encourage, urge, counsel, advise *and* practice the cohabiting of one male person with more than one woman and in furtherance and pursuance of said conspiracy and to effect the object thereof, did commit the following acts:"

(1) That from June 1, 1935, to March 1, 1944, in Salt Lake County, State of Utah, defendants published and distributed once each month, a pamphlet called "Truth"; (2) that on July 1, 1942, defendants purchased a house at 2157 Lincoln Street in Salt Lake City; and (3) that in 1942 and 1943 in Salt Lake County the defendants attempted to convert Helen Smith to believe in and to live in polygamy. Other

overt acts alleged, were not submitted to the jury for consideration.

Defendants moved to quash the information on two grounds only: (a) That it does not charge the commission of any public offense; and (b) that it states matters amounting to legal justification. Independent of any interpretation by counsel, the information suggests that ■ defendants as a group agreed to practice polygamy, a felony. Since an agreement between one man and a plural number of women to practice polygamy, followed by the overt act of polygamous marriage of the persons so agreeing, would constitute the substantive offense of polygamy by the man, a serious question might arise as to whether such an agreement would charge conspiracy. Defendants did not move to quash on the ground that the information is ambiguous, uncertain, or that it charged more than one offense.

If "the" appeared in lieu of "and" in the two places italicized, and "of" appeared after the word "practice" in each instance, the information would read the way the State apparently construes it. From the argument of defendants in assailing the information for failure to state a public offense, it would appear that in spite of the awkward and ambiguous sentence structure, appellants have apparently adopted the construction urged by the State, that the information attempts to charge a conspiracy to commit acts injurious to public morals, by an agreement entered into between defendants to advocate, teach, counsel, advise, encourage and urge other persons to engage in the practice of polygamy and the cohabitation of a man with more than one woman.

Since the alleged conspiracy relates to acts injurious to public morals, the primary question to be determined in testing the sufficiency of the information is, Does the advocacy of the practice of polygamy and the urging of other people to engage in such practices within the State of Utah, constitute *acts* injurious to public morals within the mean-

ing of the conspiracy statute? At the oral argument counsel for appellants contended that *advocating* the practice of polygamy is merely the expression of an opinion or belief; that such teachings do not constitute *acts;* that such advocacy consequently could not constitute acts injurious to public morals; and that such expressions of opinion and belief are immune from prosecution under the constitutional guarantees of religious liberty and freedom of speech, and could not properly be the subject of criminal conspiracy. They further contend that in a recent case in the United States district court involving a number of the defendants in this case, *(United States* v. *Barlow et al.,* D. C., 56 F. Supp. 795), it was held that advocating the practice of polygamy as a religious belief, does not tend to deprave public morals. They also claim that by reason of the fact that the appeal by the government was dismissed by order of the United States Supreme Court, (323 U. S. 805, 65 S. Ct. 25, 89 L. Ed. 642), such decision on such a question became final and conclusive, and is binding on the courts of this state.

In that case some of the defendants here were indicted for conspiracy to violate 18 U. S. C. A. § 334 as amended, which forbids mailing of "obscene, lewd, or lascivious" books, pamphlets, pictures, "or other publication of an indecent character." The defendants were alleged to have published and circulated "Truth" magazine, the publication and distribution of which are charged as overt acts in this case. *United States* v. *Barlow,* supra [56 F. Supp. 797], was dismissed, because in the opinion of the Federal judge the excerpts from said magazine charged in the indictment as nonmailable matters under the Federal statute, were not calculated to "corrupt and debauch the minds and morals" of those into whose hands such publications might come. The opinion relates to the interpretation of the Federal statute, and states that the indictment does not charge an offense against the United States. The opinion does state that editorials in such magazines advocate the practice of polygamy, but while stating that such publication is not

subject to prosecution under Federal statutes, the language recognizes that the act in question might well be subject to prosecution under the laws of Utah:

"The constitution of Utah prohibits polygamous or plural marriages. It might well be said that any prosecution for violations thereof under our theory of government is a purely local matter for the state rather than the Federal Government, in the absence of a widespread violation of the law."

Absent any constitutional limitation on the power of a state to legislate, an adjudication by a Federal court that a specified act does not contravene a Federal statute does not even warrant an inference that such conduct would not violate a state statute. Appellants' contention to the contrary is without merit.

Article III of our State constitution prohibits plural or polygamous marriages. Statutes enacted pursuant thereto, Secs. 103-51-1 and 2, U. C. A. 1943, makes felonious both the practice of polygamy and cohabitation of a man with more than one woman. Such relations are regarded by the law as meretricious. Conduct which induces people to enter into such felonious meretricious relationships, is certainly conduct injurious to public morals. Defendants, however, contend that if a conspiracy could be charged for expression of beliefs and ideas, then every effort to change some obnoxious law or some objectional constitutional provision could be thwarted by a conspiracy charge. There is a vast distinction between advocating a change in the law by appropriate legislation, and urging people to commit acts in violation of the law. Advocating violation of law is not an equivalent of urging repeal of the law.

Admittedly, a person cannot properly be prosecuted for expressing opinions nor for mere beliefs and personal convictions, however peculiar or repugnant they might seem to others. However, conduct condemned by statute may not

"be made a religious rite and by the zeal of the practitioners swept into the First [or Fourteenth] Amendment." *Murdock* v. *Pennsylvania*, 319 U. S. 105, 63 S. Ct. 870, 873, 87 L. Ed. 1292, 146 A. L. R. 81. *State* v. *Barlow et al.*, 107 Utah 292, 153 P. 2d 647.

Statutes do not attempt to regulate beliefs, but conduct. Freedom of speech and of religion are not unlimited licenses to do unlawful acts under the labels of constitutional privilege. Expressions and the use of words may constitute verbal acts. Words may ignite and inferno of mob violence. As stated by Mr. Justice Holmes in *Schenck* v. *United States*, 249 U. S. 47, 39 S. Ct. 247, 249, 63 L. Ed. 470:

"The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force."

See also *Gitlow* v. *New York*, 268 U. S. 652, 45 S. Ct. 625, 630, 69 L. Ed. 1138, wherein the court said:

"That a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, or disturb the public peace, is not open to question."

In *Davis* v. *Beason*, 133 U. S. 333, 10 S. Ct. 299, 300, 33 L. Ed. 637, wherein petitioners had been convicted of a conspiracy to obstruct the due administration of the laws of Idaho, the Supreme Court in upholding the judgment said:

"Bigamy and polygamy are crimes by the laws of all civilized and Christian countries. They are crimes by the laws of the United States, and they are crimes by the laws of Idaho. * * * If they are crimes, then to teach, advise, and counsel their practice is to aid in their commission, and such teaching and counseling are themselves criminal, and proper subjects of punishment, as aiding and abetting crime are in all other cases."

We therefore hold that an agreement to advocate, teach, counsel, advise and urge other persons to practice polygamy and unlawful cohabitation, is an agree-

ment to commit *acts* injurious to public morals within the scope of the conspiracy statute.

Other than agreements to commit certain felonies which require no overt acts, an unlawful agreement ▮▮▮ as defined in Sec. 103-11-1, U. C. A. 1943, does not amount to a conspiracy according to the specifications of Sec. 103-11-3,

"unless some act, besides such agreement, is done to effect the object thereof by one or more of the parties to such agreement."

Thus, a criminal conspiracy essentially consists of an unlawful agreement plus some overt act or acts done to further or to accomplish the object of such an agreement. Defense counsel claim that the information does not show that any alleged overt act was either unlawful or effective. An act done in furtherance of an agreement need not succeed in accomplishing its objective in order to fulfill the requirements of the statute. Thus, the failure to allege that the attempts to convert Helen Smith to believe in and to live in polygamy were successful, would not render the information deficient.

Appellants urge that the right to purchase property is a constitutional privilege, whether for purpose of having a place of worship, a home, for social gatherings or other uses in the pursuit of happiness, and that such purchase could not be an overt act. The argument seems ▮▮▮ to miss the point. An act need not be unlawful to be an overt act. It must necessarily be an act which is done in furtherance of the object of the unlawful agreement. *State* v. *Erwin et al.*, 101 Utah 365, 120 P. 2d 285. The purchase of a gun ordinarily is a lawful act; yet, if there is an agreement to commit murder (which is a criminal conspiracy without any overt act), the purchase of a gun by one of the conspirators for the purpose of carrying out the homicidal agreement would be an overt act. The procurement of any tool, device or instrumentality by one who has entered into the unlawful agreement, which constitutes

a step toward the accomplishment of the object of the agreement, is an overt act. There must, of course, be proof that the overt act as alleged was done in furtherance of the unlawful agreement. The information, however, need not allege the circumstances which show connection with the unlawful scheme and that such act was done in furtherance of the unlawful agreement. Such details may be supplied by a bill of particulars.

The three alleged overt acts stated in the information which the court permitted to remain when the case was submitted to the jury, are sufficient statements of overt acts to uphold the information. Whether there was sufficient proof to show that such acts were actually done by the persons alleged and done in furtherance of the alleged unlawful scheme is another question presently to be considered.

While defendants assign as error the refusal of the court to order the district attorney to furnish a bill of particulars, such assignment of error is not argued, and hence must be deemed to have been abandoned. There are numerous other assignments of error relating to admission and exclusion of evidence wherein appellants complain that the court erred, without specifying wherein error occurred and without arguing such alleged errors. Of the 186 alleged errors specified, we shall consider those only which are properly specified and which are argued. Those not argued are deemed to have been waived.

Appellants challenge the verdict on the ground that the evidence was insufficient to support a conviction of the defendants as a whole or any of the defendants. They claim error in failure of the court to give their request for directed verdict as to each defendant. It is contended that the State failed to prove that the defendants entered into the agreement alleged. They also argue that there was not sufficient competent proof to show that each defendant was a party to an unlawful agreement, and that no overt act was satisfactorily proved.

The State had the burden of proving that there was actually a conspiracy, that there was a meeting of the minds between the defendants on the unlawful scheme alleged, and that one or more of such defendants so agreeing committed some overt act or acts in further- ance of the object of such unlawful agreement. The rule of presumption of innocence applies to each individual defendant. The fact that a defendant may be charged as a coconspirator does not deprive him of any of those safeguards called due process of law, which necessitate that evidence produced against him shall be competent, relevant and material.

An alleged unlawful agreement may be proved by circumstantial evidence insofar as the evidence is competent; but until a defendant is proved by competent evidence to have entered into or to have joined in the alleged unlawful agreement, extrajudicial statements and admissions of codefendants which tend to implicate him as a party to the agreement or in some overt act, are hearsay and inadmissible as to him. However, when a defendant is shown by competent proof to be a party, then all other persons proved to be parties are his agents for purposes of the unlawful agreement so that acts of such other parties relating to the unlawful agreement or overt acts in furtherance of the agreement are binding upon him under the rules of agency. *State* v. *Erwin*, supra. Until a defendant is proved to be a principal, other defendants shown to be parties would not be his agents, and statements made out of his presence would not be binding upon him regardless of how they might tend to implicate him.

Likewise, where proof of an unlawful agreement is furnished by an accomplice, there must be sufficient corroborative evidence to identify each defendant as a party to the unlawful scheme. If, as to any particular defendant, there is lacking corroborative evidence of that given ██ ██ by an accomplice, the verdict against him cannot stand. Since the transcript shows that evidence introduced to prove that certain defendants were parties to the unlaw-

ful agreement or that they later joined in such agreement, was but hearsay, the verdict as to those particular defendants cannot be upheld. As to some defendants identified as parties to the scheme by the testimony of an accomplice, there was no corroboration by competent evidence, and the verdict as to those defendants likewise must be set aside.

There is some evidence which, standing alone, is just as consistent with innocent conduct as with any theory of unlawful conduct, as such cannot satisfy the requirements of proof. For example, testimony that a certain defendant was seen engaging in conversation with a defendant shown to be a party to the unlawful agreement, without disclosure as to what was said, neither proves that such defendant entered into an agreement nor that if an agreement of some kind was made that it was the unlawful agreement alleged. There were also numerous statements of State's witnesses that a certain defendant "discussed polygamy" without detailing what was said about it. Such generalities have no probative force. The testimony that a defendant "discussed the subject of plural marriage" is not the basis for the slightest inference that anything charged by the State ever occurred. If the witness had testified that a defendant "discussed the subject of crime," no inference could be drawn that he urged some one to commit a crime, nor that he solicited some one to enter into an agreement to commit crime.

There was considerable testimony that some defendants attended meetings at which the subject of polygamy was discussed; that at such meetings some speakers made statements that they had a right to practice polygamy; that the law could not stop them; and that it was the duty of the women to go out and get other wives for their husbands. Mere attendance at meetings is not evidence that the members of the audience entered into any agreement, nor could it imply that the listeners were responsible for what was said at such meetings. The complement of freedom of speech is the right to listen to a speaker's

views. Even if a speaker urges violation of the law, no inference can be drawn from such fact alone that members of the audience entered into an agreement to confederate with such speaker to carry out the design or scheme of such speaker. While coupled with other facts and circumstances, attendance at a meeting where persons proved to be conspirators address a meeting, might forge a chain of circumstantial evidence of an agreement with such conspirators; yet standing alone, such passive attendance at such meetings would not have sufficient probative value to warrant an inference of unlawful conduct.

Appellants argue that the evidence as a whole merely shows that defendants met for religious purposes; that they conducted worship, expressed *beliefs* concerning the hereafter; that any person in the congregation was permitted to express his views; and that such meetings and discussions held openly and without barring the general public, were all in the exercise of the constitutional rights of freedom of worship and freedom of speech. Since a conspiracy must necessarily involve some agreement to do something which the parties do not have a right to do, they contend that defendants did only what they had a constitutional right to do, and that consequently no conspiracy could be spelled out from such events.

It is true that *some* evidence introduced by the State would merely show that certain defendants attended such meetings; that some meetings were conducted as religious services; that speakers and classleaders read from the Bible and other religious works; that tithing was collected, and in part used for relief of persons in economic distress; that at some services topics were discussed such as brotherly love, faith in God, repentance, baptism, patriotism, honesty and rewards after death; that at certain meetings speakers discussed polygamy, reading from the Bible and making the claim that the ancient polygamous marriage system was instituted of God, and that "plural marriage is a law of God"; that some individuals at these meetings declared that legislation prohibiting the practice of polygamy violates the

spirit of the First Amendment to the Federal Constitution; that some speakers denounced officials of the Mormon Church for excommunication of people for teaching or practicing plural marriage, stating that the leaders of said church have "no divine authority" and that such church is apostate; and that some services were conducted as "testimonial meetings" at which members of the congregation arose voluntarily to express their views on any subject, and to acknowledge gratitude of God. Counsel for appellants say that this prosecution is nothing more than persecution of appellants for expression of unorthodox views and for membership in an unpopular minority group.

If it were true that none of the defendants did anything other than to attend meetings as indicated above, expressing disagreement with some other denomination, criticizing legislation, and giving opinions on religious subjects, none of the convictions could be upheld The right of free speech cannot be curtailed by indirection through a charge of criminal conspiracy. However, an examination of the entire record discloses that the foregoing statement of evidence does not present the entire picture as to some of the defendants.

We have reviewed the record carefully and conclude that the evidence is, sufficient to show an agreement to advocate, counsel, advise and urge the practice of polygamy and unlawful cohabitation by other persons; and that the following named defendants were parties to such unlawful agreement: Joseph White Musser, Guy W. Musser, Charles Frederick Zitting, Heber Kimball Cleveland, Zola Chatwin Cleveland, Jonathan M. Hammon, Ross Wesley LeBaron, John Y. Barlow. Albert Edmun Barlow, Edmund Francis Barlow, Ianthius Barlow, Juanita Barlow, Louis A. Kelsch, Dr. Rulon Clark Allred, David B. Darger, Jean Barlow Darger, Rulon T. Jeffs, George H. Kalmar, Joseph Lyman Jessup, and Alma A. Timpson.

As to the other defendants, there is not, in our opinion, sufficient competent proof, to show that they were parties to the agreement. In some instances, as to defendants

against whom the proof is insufficient, there were admissions that they themselves had entered into polygamous relationships; but standing alone such admissions do not constitute proof that they had entered into an agreement to induce third parties to enter into such practice. Some of the women defendants stated in testimonial meetings that they were "happy with their sister wives" and that they helped each other with the housework. Such statements, standing alone, would not be proof of any unlawful agreement to urge others to practice polygamy. Some statements of some defendants would tend to show that said defendants were victims, rather than principals.

An admission by a person that he had engaged in the commission of some crime or had aided or abetted it in some way, would not be the equivalent of an admission that he had entered into an agreement with some one else to attempt to get others to commit the same kind of crime. Certain evidence tends to show that some defendants associated and communicated with each other because they had violated the law by previously entering into unlawful practices and that they sought refuge from prosecution.

There is sufficient competent evidence that the defendants hereinabove specifically named made such statements and did such other acts as to show a meeting of the minds on the unlawful scheme alleged. They used the mechanism of an organization ostensibly and perhaps sincerely designed for religious purposes to commit overt acts in furtherance of their unlawful agreement. Contrary to the arguments of counsel, these particular defendants did not merely express beliefs and limit their remarks to mere academic discussions. It is true that they discussed theological topics at some of their meetings; but they also spoke about polygamy in such a way as to evidence a design to induce others to act and pressure was applied to several people.

Without attempting to detail all of the evidence which shows an agreement such as alleged, we direct attention to certain evidence. Some of the men claimed in public that

they had the right to perform polygamous marriages. They proclaimed that polygamy *must* be lived, one defendant saying that the law makes no difference with them. One defendant declared that polygamy should be practiced at present; that public relief "was instituted of the Lord for the polygamy people," and that they should get on relief and stay on relief. One defendant announced that it was the duty of women to find other wives for their husbands. Some also announced in meetings attended by persons not indulging in such practices, that no woman should prevent her husband from taking another wife, and that she should go along with her husband or else step aside so he could take another wife, and that men should have the courage to act. At one of these meetings, one Heber C. Smith, Jr., was made the specific object of remarks of various defendants.

We cite this evidence of acts which tend to prove the agreement itself, which shows a systematized plan to induce others to enter into the practice of polygamy, in which scheme of advocacy a number of these defendants participated. Although, as heretofore stated, it is not essential to the existence of a conspiracy that the object of such conspiracy be actually accomplished, it would appear from the evidence that the efforts to induce Heber C. Smith, Jr., to practice polygamy were actually successful, and that he and his family were among the victims of this conspiracy. There is some evidence that LeBaron with the aid of his wife, and the arrangements made by Zitting, induced a 13 year old girl to agree to be his polygamous wife. Zitting told her all she would have to do is bear children. While no marriage ceremony was proved, such proof was not necessary. LeBaron stated to the father of this witness that the girl was his wife.

That this agreement contemplated actual inducements and solicitations directed at others is evident from the testimony of a defense witness. She testified that defendant Hammon stated in one of the meetings that if a man is interested in a girl who is under age and he wants the girl, he should go to the father and first obtain his consent.

The witness stated that she understood this to relate to polygamy.

What we have said hereinabove disposes of the argument that none of the defendants did anything except engage harmlessly in the expression of religious beliefs. In fact, some of these defendants wilfully broke up the home of Helen Smith by persistently urging and inducing her husband to enter into the practice of polygamy. The solicitations which induced Heber C. Smith, Jr. to enter polygamy, all in opposition to the interests and desires of his wife, Helen Smith, and the consequent broken home from the divorce which followed, are a complete answer to the contention that none of the defendants said or did anything which could be construed to be injurious to public morals. The claim that everything was on a voluntary basis and that the wishes of others were respected, is unconvincing in view of the unrefuted evidence to the contrary. The contention that all the defendants confined their activities to expressions of beliefs without interfering with the rights of others, and without attempting to induce others to act, is not sustained by the record.

Appellants argue that the alleged overt acts were not proved. It is urged that the publication of "Truth" magazine could not be an overt act in view of the constitutional guarantee of freedom of the press, since only a few editorials could be construed as advocating the practice of polygamy. It is true that the State relied on a few excerpts from said magazine which was published over a period of nine years. A question might arise ordinarily as to whether the publication of a periodical involving numerous issues and extending over a period of years could be considered as one all-embracing overt act. This publication started in 1935. In order to have been an overt act, the unlawful agreement must have previously come into being; for an overt act is something done in furtherance of the object of the unlawful agreement. The unlawful agreement in this case appears to have been entered into after "Truth" magazine had been published for several years.

As to those issues, they could not constitute any overt act. Some of the articles appearing in those magazines were reprints of articles advocating the practice of polygamy, published many years before statehood and prior to enactment of legislation by this state prohibiting such practices. In view of other matters we are not called upon to decide whether reproduction of those articles amounts to a present advocacy of such a practice.

Since the State introduced evidence which would tend to show that the house purchased by two of the defendants was used for religious services and for social gatherings, which were admittedly lawful objects, it is urged that such purchase could not be construed as an overt act. People have the right to purchase property for all lawful purposes. The fact that some defendant entered into an unlawful agreement would not necessarily constitute proof that the purchase was made in furtherance of the unlawful scheme. A purchase may be made for more than one purpose, for both a lawful and for an unlawful purpose. There is some evidence that the building was intended to be used in part at least by some of the defendants to advocate the practice of polygamy and unlawful cohabitation. There is also evidence that the house was used as a place of solicitation and to importune people to enter into polygamous relationships. An act done in furtherance of an unlawful agreement is an overt act even if there are additional objectives which happen to be lawful. However, where property is acquired for some purpose which is lawful, evidence that it was also acquired in furtherance of an unlawful scheme must be clear and unequivocal. There is evidence of such a character here.

It is contended that the solicitation of Helen Smith to agree to allow her husband to marry some other girl and to induce her to aid in establishing a polygamous relationship did not constitute an overt act because it was obvious that no amount of persuasion could possibly be effective. Such argument disregards the nature of an overt act. The object of the unlawful scheme was advocat-

ing and urging others to enter into prohibited relationships. Whether such inducements could succeed would not be material. The systematic solicitation, and urging of others to violate the law, went far beyond mere expressions of opinion contemplated by the guarantee of freedom of speech. Words were employed in conversation with Helen Smith with a design to induce her to consent to the proposed meretricious relationship. Pressure was applied to her husband and to her in the endeavor to overcome her antagonism. It is true, of course, that she would not have committed the crime of polygamy by giving her consent, but if she had yielded to the solicitations of certain defendants she would have been required to share her husband with some other woman or women; and because she refused to submit, her home was broken up by reason of the fact that her husband was induced to take a polygamous wife in spite of her objections and refusals.

Defendants challenged the right of Helen Smith to testify. They claim she was disqualified as a witness because her former husband was named a defendant, although the State severed as to him. Her divorce from Heber C. Smith, Jr. had become final prior to the date of trial so that she was no longer the wife of said Smith. She could not therefore have been testifying against her husband as contended by appellants. See 70 C. J., "Witnesses," p. 125, Sec. 152 and cases cited; and 4 Wigmore on Evidence (2d Ed.) Sec. 2237 at p. 775.

The remaining question relating to her testimony is whether the court committed prejudicial error by overruling objections to questions as to what Heber C. Smith, Jr. said to her at the time he was still her husband. It is claimed that in view of the language of Sec. 104-49-3 (1), U. C. A. 1943, any conversation between them during their marital status was privileged and that she could not divulge it. The statute, exclusive of the exception clause, forbids either husband or wife "during the marriage or afterwards" to be examined as to any communication made by one to the other during the marriage without the

consent of the other. *In re Ford's Estate,* 70 Utah 456, 261 P. 15, it is stated that the "communication" between husband and wife contemplated by said statute consists of those communications and knowledge imparted which are confidential in character.

In substance, Helen Smith testified that Smith told her at the time she was still his wife, while they were on their way to one of the meetings with some of the defendants, that he thought that Barlow could convince her that she was wrong in opposing plural marriage. Just prior to their going to the Musser home he told her that he would like to have her hear Musser's views on plural marriage and that she would likely feel differently about it. Such remarks related to subjects which were to be and were discussed with third parties. Consequently, it could not be deemed confidential.

Furthermore, the question presented by the assignment of error was not presented to the court below. The only objection interposed below to the testimony of Helen Smith relative to these conversations with Heber C. Smith, Jr. was that it was incompetent, irrelevant, immaterial and hearsay. No objection based on communications between husband and wife was made. An objection to testimony on the ground of privilege is not properly made when based on the ground that it is incompetent. *Proffit* v. *United States,* 9 Cir., 264 F. 299. Underhill's Criminal Evidence, (4th Ed.) p. 682.

In connection with the argument that the court committed prejudicial error in excluding defense testimony, we note that counsel for appellants repeatedly asked the following question:

"Did anyone at these meetings *urge* people to enter plural marriage?"

Objections were repeatedly sustained, although some of the witnesses for the State said in their testimony that certain defendants at these meetings *urged* the practice of polygamy. No harm could have resulted from permitting an answer to

the question as worded, although technically the question did call for a conclusion.

Prejudicial error is claimed by reason of certain comments of the trial judge on matters relating to evidence and to defendants. The matter most seriously argued related to contents of a pamphlet exhibited to a witness for the State who was an accomplice. On direct examination she had testified that some of the defendants had discussed polygamy with her and that defendant Cleveland had talked to her and read to her from a certain pamphlet on marriage of which defendant Joseph W. Musser was one of the authors. On cross-examination certain parts of the booklet were read to her and she admitted that they were some of the portions Cleveland had read to her and she indicated that certain other parts sounded familiar. Later, counsel for defendants attempted to introduce the pamphlet in evidence, and since there had been read into the record the portions alleged to have been read to her, the offer was properly refused. However, in ruling on the offer the following colloquy took place:

"Mr. Patterson: It seems to me this is material for the reason she testified she was taught from this book, and the best evidence of what she was taught * * *

"The Court: This book is not on trial. Cleveland is on trial.

"Mr. Patterson: She stated she was taught from this book.

"The Court: *There are lots of nefarious books written.* I will exclude that."

The italicized expression was improper, notwithstanding it is undoubtedly categorically correct as a statement of fact. A correct statement of fact may be entirely out of place when made at the improper time or by some person whose duty it is to refrain from making such a remark under the circumstances. A trial judge in a jury trial might be making a correct statement of fact by volunteering that a defendant on trial was tried in his court on some prior occasion and convicted, but the remark would

clearly be grounds for a mistrial. The booklet in question here was written by one of the defendants.

The statement without its context and the circumstance which brought it forth would be but an irrelevancy. But when made in response to an argument urging the admissibility of the book and when followed by the statement, "I will exclude that," the jury may well have construed it as a characterization of the publication.

Portions of the book had been received in evidence. The court's remark, if construed by the jury as indicated, would constitute a comment on the evidence. In this jurisdiction, such comment is not within the province of the court. *State* v. *Green*, 78 Utah 580, 6 P. 2d 177. And if so understood by the jury, the remark could not be regarded as non-prejudicial. Characterizing as "nefarious" a publication written by a defendant and used by other defendants in what they contended was propagation of religious views, could not but convey to the minds of the jurors the impression that the court thought that the writer of the book and the propagators of the views therein expressed are iniquitous.

No objection was made nor any exception taken below to this comment. Had there been, and had the implication been called to the court's attention, doubtless the implication would have been erased and any inference therefrom on the part of the jury would have been forefended. Where irregularities are such that a harmful result could not be obviated by any further action, such irregularities may be held ground for reversal, although not excepted to in the trial court. See *People* v. *Mahoney*, 201 Cal. 618, 258 P. 607. But since the indicated implication in the statement of the court was probably not intended, that situation did not present itself. Nevertheless we are constrained to discuss the assignment and to point out its probable prejudicial effect.

Appellants contend that they were denied an impartial jury trial because the judge refused to exclude from the jury panel all members of the Church of Jesus Christ of Latter-

Day Saints, (for convenience herein called the "Mormon Church"). The judge stated that no one would be excluded from the jury merely by reason of church affiliation. On challenge of some Mormon jurors for alleged bias, on voir dire examination each of them stated that regardless of the emphatic stand of the Mormon Church against the advocacy or practice of polygamy, he would try the case according to the evidence and the court's instruction. The charge of bias was not substantiated.

In the effort to impeach said Mormon members of the jury panel for alleged religious prejudice, defense counsel over objection of the prosecution, asked such prospective jurors *if they did not know:* (a) That some of the defendants had been excommunicated from said church for advocating or practicing polygamy; (b) that no one is ever excommunicated without a trial at which evidence is produced, and the member charged with misconduct is given an opportunity to defend; and (c) that judgment of excommunication is based on a finding that the communicant has been guilty of "teaching, preaching or practicing polygamy." Counsel for defendants conveyed to the jurors information that some of the defendants had been found guilty in an ecclesiastical forum of the Mormon Church of either advocating or practicing polygamy. Whatever prejudice might have been engendered by such defense tactics could not serve as a premise on which to predicate reversible error. Nor could such facts brought into the case by defendants themselves show that individual jurors were biased.

Prejudice is claimed by reason of alleged erroneous questions propounded by the court in the interrogation of jurors, and by reason of certain comments made in relation thereto. The court had a rather exacting job as 89 prospective jurors were examined. Rather early in that process a juror stated that he had formed an opinion as to the guilt or innocence of the defendants, and on further examination stated that "it could be changed" as the case went on; and counsel for defendants subsequently made objection, and in con-

nection with the challenge of a juror for cause, counsel for defendants argued that

"if it takes evidence to change that mind he is not eligible. That is the law."

To which remark the court responded,

"Not in this court, I am sorry to say."

Subsequently, a juror stated that he had formed an opinion as to the merits of the case; that he could not help it, and that his opinion related to the guilt or innocence of defendants. The court then asked:

"Is it such an opinion that it would not yield to the facts presented here in the court room before you for your consideration, as a juror?"

After objections of counsel, the juror answered:

"It would take evidence to change my opinion. Does that answer it? I have formed an opinion. I couldn't help it."

The court then inquired:

"The opinion you now have—could the opinion you now have be removed by the evidence you heard in this court and altered and changed?"

He replied:

"Yes, sir, by evidence it could."

Following considerable argument, the judge asked:

"Is your opinion [such] * * * that you could lay it aside and consider this case on the evidence presented here, and the instructions of the court, and finally render a fair and impartial verdict based solely upon the evidence produced here in the court room?"

The answer was:

"By the evidence, yes sir."

The challenge for cause was denied.

A short while later, it appeared that a juror had listened to a discussion of the case. The court asked:

"Have you got an opinion now that is of such fixity in your mind that it would not yield to the evidence produced here?"

A negative answer was given.

None of the veniremen whose examination is here discussed served as jurors. They were excused on peremptory challenge. Appellants, however, contend that they were prejudiced by the denial of their aforesaid challenges for cause in view of the fact that they were required to exercise three of their peremptory challenges which might have been interposed to other veniremen who actually served on the jury. Appellants exercised all of their peremptory challenges.

As noted above, the exception taken to the propounded questions of the court was to the effect that if a juror had an opinion which it would take evidence to remove, then he could not be an impartial juror since he could not accord to the defendants and each of them the presumption of innocence. Standing alone, the questions set out hereinabove might be construed by the jurors addressed, and the others present who heard the questions, to mean that the jurors might carry with them to the jury room the opinion formed prior to trial and, unless that opinion was changed by the evidence, return a verdict in conformance therewith. It should not be necessary to say that this is, of course, not the law.

However, at the outset of the examination of the jury, the court instructed all of the prospective jurors that those chosen to serve must determine the facts in accordance with the evidence produced in court; that their verdict should be based solely upon that and nothing else. He pointed out specifically that each defendant was clothed with the presumption of innocence and that unless that presumption was overcome by evidence produced in court which proved the guilt of the defendants beyond a reasonable doubt, they

were entitled to an acquittal. In such initial discourse to the injury, the following statement by the court was made:

"The mere fact that you have read about this case in the newspapers or that you have discussed it with others or heard it discussed by others, or that you have formed or expressed an opinion based solely upon newspaper accounts of the case or gossip or common notoriety, those things in and of themselves do not disqualify you as serving as jurors on the case if you can in spite of that and nevertheless be fair and impartial, put to one side any opinion that you have ever formed based upon the sources that I have indicated."

As to the jurors examined and not excused for cause upon challenge, each had indicated that any opinion that he had formed or expressed was based upon newspaper articles, common notoriety and gossip and that none of them had any direct information with respect to the facts in the case. Of numerous jurors the question was asked as to whether that juror could lay aside his opinion and consider the case on the evidence presented in court and finally render a fair and impartial verdict based solely upon such evidence. Just prior to the exercise of peremptory challenges, the court again called attention to the presumption of innocence that attended each defendant and asked generally of the panel as to whether there was any one present on the jury who would not be willing to accord each defendant the presumption of innocence until their guilt was proved beyond a reasonable doubt.

In the light of these instructions and comments made by the court subsequent to the answers of jurors in question, we are of the opinion that the jurors could not have been left with the impression that they were qualified to sit as jurors if they entertained an opinion which would require evidence to remove. While the remarks of the court were unfortunate, it appears to us that when the entire picture of events is properly regarded, the effects of the statements complained of were erased from the minds of the jurors. A number of jurors were excused for cause upon challenge, after indicating that they had an opinion relative to the guilt or innocense of the accused which would

prevent them from acting impartially in the case.

Section 105-31-21, U. C. A. 1943, provides in part:

"* * * but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury founded upon public rumor, statements in public journals or common motoriety; provided, it appears to the court, upon his declaration under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters submitted to him."

This provision has been in existence in this state since territorial days and has been construed and applied in numerous cases. See *State* v. *Haworth*, 24 Utah 398, 68 P. 155; *People* v. *Hopt*, 4 Utah 247, 9 P. 407; *Hopt* v. *People*, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708; *Thiede* v. *People*, 159 U. S. 510, 16 S. Ct. 62, 40 L. Ed. 237. What we here say should not be construed as in any way departing from the rules therein announced. We are of the opinion that on the whole record, the objections made and exceptions taken, that this assignment of error is not well founded. It is therefore overruled.

In pronouncing sentence, the court announced that the defendants Juanita Barlow and Jean Barlow Darger were under 18 years of age at the time the offense was committed and expressed some doubt as to the jurisdiction of the court to proceed against those two girls. They were not accused of a felony but an indictable misdemeanor. Sec. 14-7-4, U. C. A. 1943, provides in part:

"The juvenile court shall have exclusive original jurisdiction in all cases relating to the neglect, dependency and delinquency of children who are under eighteen years of age, except in felony cases as hereinafter provided, * * *."

Section 14-7-6, U. C. A. 1943, provides:

"No child under eighteen years shall be charged with or convicted of a crime in any court except as provided herein. If during the pendency of a criminal or quasi criminal charge against any person in any other court, except felony cases brought before the district courts, it shall be ascertained that said person was under the age of eighteen

years at the time of committing the alleged offense, it shall be the duty of such other court to transfer such case immediately, together with a transcript of the proceedings and all the papers, documents and testimony connected therewith, to the juvenile court having jurisdiction. * * *"

As to those two defendants, the case should have been transferred to the juvenile court. While no assignment of error calls our attention to the error committed in trying and sentencing the two named defendants in ██ ██ the district court we take cognizance of that court's want of jurisdiction. The conviction and sentence of Juanita Barlow and Jean Barlow Darger must be set aside.

As to defendants other than the 20 hereinabove specifically named, the judgment is reversed with directions to dismiss as to them. As to the 20 defendants hereinabove specifically named, there is sufficient evidence to support a judgment of conviction. However, for reasons hereinabove set out the conviction of Juanita Barlow and Jean Barlow Darger is set aside with instructions to transfer the case as to them to the juvenile court in accordance with the cited statute. The judgment as to the other 18 defendants hereinabove specifically named, against whom the evidence is sufficient, is affirmed.

WADE and WOLFE, JJ., concur.

LARSON, Chief Justice.

I concur in that part of the opinion upholding the information and declaring that an agreement to counsel, advise and urge other persons to practice polygamy is an agreement within the scope of the conspiracy statute. I concur in the holding that the evidence is insufficient to sustain a verdict against any defendant other than the 20 held by the prevailing opinion. I agree that as to Juanita Barlow and Jean Barlow Darger the sentence and conviction must be set aside for the reasons stated in the opinion.

Now I note the matters in which I must dissent. I think

the questions asked Helen Smith as to what was said to her by her husband relative to Barlow and Musser were in the nature of communications which are confidential under the provisions of Sec. 104-49-3(1), U. C. A. 1943. However, that does not avail the defendants because: first, no objections was made on the grounds of privileged communication; second, such objection is only available to the other spouse; and third, Heber C. Smith, the husband, is not one of the 20 defendants as to whom we hold there is evidence enough to go to the jury.

I think the opinion is in error on the question involving the competency of certain jurors. To my mind the record compels the conclusion that the trial court was in error in denying the challenge of defendants to such jurors. I fear the effect of the holding of the opinion will be to render any talesman competent to sit as a juror if he says he will try the case fairly and impartially even though he has a fixed and determined opinion of defendant's guilt or of his innocence as unmovable as Gibralter. During the examination of talesman as to his qualifications to sit as a juor, when the talesman stated that he had formed an opinion as to the merits of the case, the court asked:

"Is it such an opinion that it would not yield to the facts presented here in the court room before you for your consideration?"

The talesman answered:

"It would take evidence to change my opinion."

The court then asked:

"The opinion you now have—could the opinion you now have be removed by evidence you heard in this court, and altered and changed?"

And the answer was:

"Yes, by evidence it could."

The challenge to the juror was denied.

Another talesman who had formed an opinion on the merits stated that

"it could be changed; as the case went on, it could be changed."

Challenge to such juror was also denied. At least three jurors were of this type. It seems elemental to the writer that a talesman who has an opinion on the question to be decided by the jury, which opinion requires evidence to change or remove, is ipso facto disqualified as a juror. Of course, jurors are not required to be blank minds, but they should be men with free and open minds; men who can enter the jury box at the beginning of the evidence utterly disregarding and oblivious to anything they may have heard or read, or any opinions or impressions they have formed. The question is not: Can your opinion be changed, but can you utterly disregard your opinion? It is not as to whether the opinion is of such fixity that it cannot be changed by evidence, but is it of such fixity that you cannot disregard it without any evidence? As far as such juror is concerned the party litigant comes to the batter's box with two strikes charged against him. It is small consolation to say:

"If you knock a home run on the first ball pitched, the handicap of two strikes charged against you before you came to bat didn't hurt you."

Who would contend that in a championship basketball game it is fair to give one team, as the game opens, 10 free throws at the basket, saying to the other team:

"If you can score enough field baskets more than your opponents to offset the 10 free throws, why you win anyway so you can't complain"?

The rule as laid down by the overwhelming weight of authority, and as repeatedly declared in this jurisdiction is, a talesman is not disqualified as a juror because he has formed or expressed an opinion as to the guilt or innocence of the accused if such opinion is one that the juror can and

will completely lay aside and disregard so he can try the case fairly and impartially upon the evidence submitted in open court like he would if he had heard nothing of the case or formed no opinion whatever. In *People* v. *Hopt,* 4 Utah 247, 9 P. 407; *Hopt* v. *People,* 120 U. S. 430, 7 S. Ct. 614, 616, 30 L. Ed. 708, the question was raised as to a denial of a challenge of a juror for implied bias. The Utah court disposed of the matter on the ground that when the jury was sworn the defendant had three unused peremptory challenges and so could not complain. The United States Supreme Court affirmed on the same ground. It should be borne in mind that both courts point out that the juror, Abbott, testified that while he had long before formed an opinion based upon what he read in the newspapers "he could go into the jury-box and sit as if he had never heard of the case" and that unless "what he had heard turned out to be the facts in the case" he had no opinion, and that "he could sit on the jury and determine the case without reference to anything he had heard." In *Thiede* v. *Utah,* 159 U. S. 510, 16 S. Ct. 62, 64, 40 L. Ed. 237, the court disposes of the question thus:

"These jurors testified substantially that at the time of the homicide they had read accounts thereof in the newspaper, and that some impression had been formed in their minds from such reading, but each stated that he could lay aside any such impression, and could try the case fairly and impartially upon the evidence presented."

In *State* v. *Haworth,* 24 Utah 398, 68 P. 155, four of the challenged jurors had formed no opinion as to the guilt or innocence of the accused. It did appear they had formed an opinion that deceased had been murdered. (A point on which there was no dispute). One juror stated that from what he had read he had formed an *opinion or impression* as to the guilt or innocence of the accused, but that he could *weigh the evidence independently of what he had read and heard* and would not be influenced by such matters or opinions formed therefrom. These jurors were held not dis-

qualified. They all come with the rule for which the writer is contending.

"A person who has formed an opinion by conversation with witnesses is, under Neb. Crim. Code, Sec. 468, incompetent to sit as a juror, notwithstanding he may swear that he can render a fair and impartial verdict." *Cowan* v. *State*, 22 Neb. 519, 35 N. W. 405.

"A juror is not disqualified because he has formed an opinion of greater or less strength from what he has read in newspapers, if he testifies that he can render a verdict according to the evidence, uninfluenced by previous opinions." *Rizzolo* v. *Com.*, 126 Pa. 54, 17 A. 520; *West* v. *State*, 79 Ga. 773, 4 S. E. 325; *Garlitz* v. *State*, 71 Md. 293, 18 A. 39, 4 L. R. A. 601; *People* v. *Gage*, 62 Mich. 271, 28 N. W. 835, 4 Am. St. Rep. 854.

"A juror having an opinion in a case, and whose declaration that he could render an imparial verdict is qualified by a doubt, is incompetent under N. Y. Code Crim. Proc., Sec. 376." *People* v. *McQuade*, 110 N. Y. 284, 18 N. E. 156, 1 L. R. A. 273.

"A juror stating that he is prejudiced in defendant's favor, but that he can find a verdict upon the evidence alone, is properly rejected on a challenge for cause." *Giebel* v. *State*, 28 Tex. App. 151, 12 S. W. 591.

"The statement of a juror on cross-examinatin, that he thinks he can try the case fairly and impartially and render an impartial verdict from the evidence, without being biased by his previously formed opinion, although it will take evidence to remove it, renders his rejection a matter within the discretion of the trial judge." *Young* v. *Johnson*, 123 N. Y. 226, 25 N. E. 363, affirming 46 Hun. 164.

"The opinion which renders a juror incompetent must be such as would influence his judgment." *Spangler* v. *Kite*, 47 Mo. App. 230.

"A juror called in a murder case is not incompetent because he heard talk about the case at the time of the offense, and may then have had some opinion, where he stated that *he has no opinion at the time of the trial*, stands impartial, and can give the prisoner a fair trial.' *Lyles* v. *Com.*, 88 Va. 396, 13 S. E. 802. (Italics ours.)

"One who has formed an opinion which it will require evidence to remove is disqualified for actual bias as a juror in a murder trial, although he states that he will try the case on the evidence and the law." *State* v. *Coella*, 3 Wash. 99, 28 P. 28; contra, *Com.* v. *McMillan*, 144 Pa. 610, 22 A. 1029.

"A juror who has formed and expressed a positive opinion of the guilt of a prisoner, and of certain specific and material facts, although it is based solely on newspaper accounts, is disqualified, even if he declares that he can render a fair and impartial verdict upon the evidence alone." *Coughlin* v. *People*, 144 Ill. 140, 33 N. E. 1, 19 L. R. A. 57. (Above quotations 40 L. Ed. pages 238, 239.)

We quote from the syllabus in *Scribner* v. *State*, 3 Okl. Cr. 601, 108 P. 422, 423, 35 L. R. A., N. S., 985:

"The opinion necessary to disqualify a juror must be one based on what purports to be the facts and one that will combat the evidence.

"The trial court is not limited to the answers made by the juror, but must be satisfied from all the circumstances as well as the examination that the juror is not prejudiced against the accused.

"Where the juror says he has an opinion, the accused should be given an opportunity to examine him fully as to the extent of his opinion."

In the concurring opinion of Mr. Presiding Judge Furman, we read:

"When a juror states that he had an opinion as to the guilt of a defendant, he is not made competent to sit in the case merely because he may state that he can and will lay this opinion aside if taken on the jury, and give the defendant a fair and impartial trial, and be governed alone in making up his verdict by the testimony of the witnesses and the charge of the court. The juror is not the judge of his own competency, of his own impartiality, and of his own freedom from prejudice. No statute can clothe him with such judicial discretion and power. * * * It is the judge and not the juror who is charged with the duty of passing upon the competency of the juror, and in the discharge of this duty the judge may have recourse to any means of information within his power. In fact he should carefully investigate every source which would be calculated to throw any light upon the competency of a juror, and if the judge is not entirely satisfied of the competency of the juror, he should be excused. * * * *Johnson* v. *State*, 1 Okl. Cr. [321], 348, 97 P. [1059], 1070 [18 Ann. Cas. 300].

"* * * The court erred in not permitting this question to be answered. While it is true that the court would not be bound by the answers of the juror, yet, when it is disclosed that a juror has an opinion, in all fairness, the court should permit the most searching cross-examination of the juror as to the origin, extent, and probable effect of such opinion. * * * But it may be said that the defendant is guilty, and that therefore it is immaterial as to whether the law was complied with. Such a statement as this is the first step toward lynch law, and if recognized by this court, would wipe out and destroy every constitutional right, and would establish a precedent which, if followed, would result in arbitrary punishment in the name of the law; * * *."

The question as to the juror's qualification is not if his opinion will yield to evidence but, can he lay it aside and disregard it so as to give the evidence its proper weight on the question: Is guilt proved? without wasting part of its strength and force in overcoming preconceived opinions on that matter? In other words, not can the opinion be overcome by evidence, but can and will the juror disregard such opinion and weigh the evidence fairly and impartially? I think the trial court erred in turning down the suggestion and request of defense that the state of mind of these jurors, and the fixity of their opinion be further explored before they be accepted as jurors. On the record as it stands, I think these jurors were disqualified and incompetent to sit as jurors, and the cause should be reversed.

There are two other matters in the record I think were error but since no exception was taken to them below, they need not be discussed.

PRATT, Justice, not participating.